## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DEANN M. TOTTA, LAURIE MORRISSEY, CHASE WATSON, and PARK G.P., INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0173-KSJM |
| CCSB FINANCIAL CORP., | ) ) | |
| Defendant. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: February 17, 2022
Date Decided: May 31, 2022

Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Counsel for Plaintiffs Deann M. Totta, Laurie Morrissey, Chase Watson, and Park G.P., Inc.*

Aaron. E. Moore, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington, Delaware; Brett A. Scher, Patrick M. Kennell, KAUFMAN DOLOWICH & VOLUCK, LLP, New York, New York; *Counsel for Defendant CCSB Financial Corp.*

**McCORMICK, C.**

The defendant is a holding company that owns a small community bank. Its directors faced a proxy contest by an insurgent who has held stock in the company for more than a decade, and who has had an antagonistic and litigious relationship with the board. The directors feared that if the stockholder gained control of the board, then he would destroy the community bank that many of the directors had lovingly served for years.

To counter this perceived threat, the directors invoked a provision in the company's charter that prohibits a stockholder from exercising more than 10% of the company's voting power in an election (the "Voting Limitation"). The directors adopted a new interpretation of that never-before-invoked provision under which the board could aggregate multiple stockholders' holdings if the board perceived the stockholders to be acting in concert with one another. Relying on that interpretation, the board instructed the inspector of elections not to count any votes above the Voting Limitation that were submitted by the insurgent, his slate of nominees, and an entity affiliated with a nominee's father. Due to this instruction, the insurgent's nominees lost the election.

The plaintiffs are the insurgent's company and nominees. They have sued under Section 225 of the Delaware General Corporation Law (the "DGCL") to invalidate the board's instruction to the inspector of elections. The parties stipulated to trial on a paper record. This post-trial decision holds that the board improperly applied the aggregation principles of the Voting Limitation to disenfranchise the plaintiffs. This decision further concludes that the board's conduct was invalid under equitable principles. For these reasons, judgment is entered in favor of the plaintiffs.

## I.     FACTUAL BACKGROUND

The court held a half-day trial on a paper record on February 17, 2022.  The record comprises 113 trial exhibits, depositions from nine witnesses, and forty-six stipulations of fact.  These are the facts as the court finds them after trial.[1]

### A.     CCSB And The Voting Limitation

CCSB Financial Corp. (the "Company") is a Delaware corporation that wholly owns Clay County Savings Bank (the "Bank").[2]  The Bank operates three branches near Kansas City in Clay County, Missouri.[3]  The Bank has underperformed financially compared to its peers.[4]

The Company's shares are thinly traded in the over-the-counter market.  As of December 3, 2020, which was the record date for the meeting of stockholders at issue in this case (the "Record Date"), the Company had 743,071 shares of common stock outstanding, comprising all of the Company's outstanding voting power.[5]  As of the Record Date, the Company's board of directors (the "Board") comprised David Feess, Mario

---

[1] The Factual Background cites to: C.A. No. 2021-0173-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript (Dkt. 75) ("Trial Tr."); and stipulated facts set forth in the Parties' Joint Pre-Trial Order (Dkt. 69) ("PTO").  The parties lodged the deposition transcripts of the following witnesses: David Feess, David Johnson, Deborah Jones, Stephanie Kalahurka, Laurie Morrissey, DeAnn Totta, Mario Usera, Chase Watson, and David Watson.  The deposition transcripts are cited by reference to the witnesses' last names and "Dep. Tr."

[2] PTO ¶ 5.

[3] *Id.*

[4] JX-48 at 4.

[5] PTO ¶ 5.

Usera, Deborah Jones, Louis Freeman, Debra Coltman, Robert Durden, and George McKinley.[6] Feess served as Board chairman. Usera has been the Company's and the Bank's president and CEO since 2013 and has been employed by the Bank since 1997.[7] Usera reported beneficially owning 78,442 shares, or 10.56% of the Company's outstanding stock on the Record Date, though he testified at his deposition that he mistakenly failed to include his daughter's shares when reporting his beneficial ownership.[8] Collectively, the Board beneficially owned 23.39% of the Company's outstanding stock on the Record Date.[9]

The Bank was founded in March 1922 as a savings and loan association.[10] The Company was incorporated in September 2002 as a holding company for the Bank, which converted to a federally chartered savings bank in 2003.[11] The prospectus for the conversion stated that the Board "believe[d] that it is appropriate to adopt provisions permitted by federal regulation to protect the interests of the converted association and its stockholders from any hostile takeover."[12]

---

[6] *Id.* ¶ 6.

[7] *Id.* ¶ 9.

[8] *Id.*; Usera Dep. Tr. at 145:18–146:14.

[9] PTO ¶ 16.

[10] JX-93 (Bank Website Page "Our History" Printout) at 1. The court congratulates the Bank on recently celebrating its hundredth birthday.

[11] *Id.*

[12] JX-104 at 142.

3

Those anti-takeover provisions appear in Article FOURTH of the Company's certificate of incorporation, which was filed September 13, 2002, and has never been amended.[13]

Article FOURTH established the Voting Limitation, which provides that "in no event" shall any "person" who "beneficially owns in excess of ten percent (10%) of the then-outstanding shares of Common Stock . . ., be entitled, or permitted to any vote in respect of the shares held in excess of the Limit."[14] The Voting Limitation is quoted in full in the legal analysis.

Article FOURTH defines "person" and "beneficial owner" using concepts like "affiliate" and "acting in concert" that result in the aggregation of shares across owners. Those definitions and their implications are quoted and discussed in the legal analysis.

Article FOURTH empowers the Board to interpret and enforce the Voting Limitation. Article FOURTH (C)(3) grants the Board the "power to construe and apply the provisions of this section and to make all determinations necessary or desirable to implement such provisions," including whether the aggregation principles apply.[15] Article FOURTH (C)(6) then provides that "[a]ny constructions, applications, or determinations made by the Board of Directors pursuant to this section in good faith and on the basis of such information and assistance as was then reasonably available for such purpose shall be

---

[13] JX-1 ("Certificate of Inc.") at 1–2; Trial Tr. at 49:8–16.

[14] Certificate of Inc., art. 4(C)(1).

[15] *Id.* art. 4(C)(3).

conclusive and binding upon the Corporation and its stockholders."[16] This decision refers to Article FOURTH (C)(6) as the "Conclusive-And-Binding Provision."

It is undisputed that, before the Company's 2020 annual meeting and director election, the Board had never applied the Voting Limitation.[17] This was so despite the fact that, in at least one prior election, a stockholder holding more than 10% of the Company's outstanding stock voted all of its shares.[18] Usera speculated at his deposition that the excess votes were not disqualified because "the number of shares that were in excess of the 10 percent had no impact on . . . the election and so there was no need to apply the" Voting Limitation.[19] It is unclear from the record whether that was in fact the case.

### B. David Johnson, Park, And The Park Nominees

Non-party David Johnson is the controlling stockholder and a board member of First Missouri Bank which, like the Bank, is a community bank with multiple branches near Kansas City.[20] Johnson is also the chairman and CEO of Maxus Realty Trust Inc. ("MRTI"), a real estate investment trust which wholly owns Maxus Properties LLC ("Maxus Properties") through a subsidiary.[21] Rounding out his business holdings relevant

---

[16] *Id.* art. 4(C)(6).

[17] JX-82 (Def.'s Resps. & Objs. to Pl.'s First Set of Interrogs.), Resp. 7.

[18] JX-12 (Dec. 20, 2017 Board Mins.) at 2–3; Usera Dep. Tr. at 49:5–51:15.

[19] Usera Dep. Tr. at 52:2–5.

[20] Johnson Dep. Tr. at 27:22–29:2.

[21] PTO ¶ 1.

to this decision, Johnson is the sole stockholder of Park G.P., Inc. ("Park"), one of the plaintiffs in this action.[22]

Johnson has been a stockholder of the Company for over a decade.[23] He testified at his deposition that he owns at least some shares of every bank in the Kansas City area.[24]

Park owned 3,398 shares of Company common stock on the Record Date.[25] Johnson asserts that he beneficially owned 73,948 shares, or 9.95% of the Company's outstanding shares on the Record Date, including Park's.[26]

Plaintiff DeAnn Totta is Park's president.[27] Totta has worked as an accountant for both Arthur Andersen and KPMG, and currently serves as Vice President of Reporting and Compliance for Maxus Properties, overseeing tax, audit, and regulatory compliance.[28] Totta did not beneficially own any Company stock on the Record Date.[29]

Plaintiff Chase Watson ("C. Watson") also used to work for KPMG, but at the time of trial served as Vice President and Director of Finance for Maxus Properties and as a

---

[22] JX-27 at 4.

[23] Johnson Dep. Tr. at 40:24–41:10.

[24] *Id.* at 41:11–14.

[25] PTO ¶ 2.

[26] *Id.* ¶ 1.

[27] *Id.* ¶ 2.

[28] *Id.*

[29] *Id.*

Vice President of MRTI.[30]  C. Watson is also a manager of MLake 96 LLC ("MLake 96"), which owned 500 Company shares on the Record Date.[31]

Plaintiff Laurie Morrissey owns and operates a marketing consulting business specializing in advertising, social media engagement, public relations, branding, business development, and fundraising.[32]  Morrissey beneficially owned 100 Company shares on the Record Date.[33]

Park nominated Totta, C. Watson, and Morrissey for election to the Board at the Company's 2021 annual meeting.[34]

### C.  Johnson's Early Attempts To Seat A Director On The Board

In connection with the Company's 2011 annual meeting, Jefferson Acquisition, LLC, solicited proxies to elect Johnson and another nominee to the two seats up for election.[35]  Johnson was a member of Jefferson Acquisition.  Johnson and the other nominee lost that election, and later that year Jefferson Acquisition filed suit in Missouri state court against the Company and the Board, claiming that the directors breached their fiduciary duties in connection with the election.[36]  The Circuit Court of Clay County,

---

[30] *Id.* ¶ 3.

[31] *Id.*

[32] Morrissey Dep. Tr. at 13:4–21; PTO ¶ 4.

[33] PTO ¶ 4.

[34] *Id.* ¶¶ 2–4.

[35] JX-106 at 3.

[36] *Id.* at 4, 6.

Missouri issued an order dismissing that action, which the Missouri Court of Appeals affirmed.[37]

Jefferson Acquisition again submitted nominees for the Company's 2012 annual election but, again, lost the election.[38] Johnson wrote a letter to Company stockholders on June 14, 2012, warning that if the Company "continues to lose money, we face the ultimate threat of a regulator take-over."[39] The Company responded with a letter signed by the Company's then-CEO, John Davis, and Usera, who was the Company's president and chief operating officer at the time.[40] Johnson sued Davis and Usera for defamation and other causes of action over the statements in their response letter, but judgment was entered against Johnson in 2014.[41]

In a notice dated May 19, 2015, and published in the Federal Register, the Federal Reserve System announced that Johnson and his wife had applied to each acquire more than 10% of the Company's common stock.[42] In addition, Johnson, his wife, and Park, "acting in concert," according to the Federal Reserve, applied to acquire up to 24.99% of the Company.[43] By letters dated June 24, 2015, the Federal Reserve Bank of Kansas City notified Johnson, his wife, and Usera that Johnson and his wife were approved to

---

[37] *Id.* at 6; JX-107 at 1.

[38] JX-105 ¶ 8.

[39] JX-108 at 1.

[40] *Id.*

[41] *Id.* at 2, 8.

[42] JX-110 at 1–2.

[43] *Id.*

8

individually acquire more than 10% of the Company, but warned that Park should not increase its ownership above 5%.[44]

In letters dated June 30, 2015, and July 14, 2015, Johnson informed the Bank, Usera, and the Board about the Federal Reserve's recent approval and noted that the Company's most recent proxy statement disclosed that "record holders of Common Stock who beneficially own in excess of 10% of the outstanding shares of Common Stock are not entitled to any vote with respect to the shares held in excess of the Limit."[45] Johnson requested a copy of the Certificate of Incorporation and asked the Board to waive the Voting Limitation, to "allow[] for any Shareholders to obtain more than 10% of outstanding shares and maintain all rights."[46]

The Company responded on July 22, 2015, informing Johnson that, in its view, although the Board "has the authority to determine the applicability of Section C as it relates to the stock ownership of any particular shareholder(s), the Board <u>does</u> <u>not</u> have the authority to simply waive that provision."[47] The letter went on to state the Board's belief "that Section C was intended to protect the interests of <u>all</u> shareholders of CCSB, and not only those shareholders owning in excess of 10% of its outstanding common stock."[48]

---

[44] JX-9 at 2–3.

[45] *Id.* at 2, 5.

[46] *Id.*

[47] JX-10 at 2 (emphasis in original). The quoted text included a footnote, which states, "[f]or example, the Board has the authority to apply the definitions included in Section C to determine whether any particular shareholder has beneficial ownership of CCSB common stock." *Id.*

[48] *Id.* (emphasis in original).

9

### D. The *Robb* Judgment

Johnson is the 85% owner and managing member of an investment company called Bond Purchase, LLC.[49] Between 2011 and 2014, Bond Purchase made four loans to three companies owned by an acquaintance of Johnson, Randy Robb (the "Robb Companies").[50] The Robb Companies collectively owned 23,007 shares of Company stock, which was offered as collateral under the three of the four notes (the "Notes").[51] The Robb Companies failed to make interest payments on the Notes, and in August 2015, Robb notified Bond Purchase that he was considering selling the Company stock to satisfy the Notes.[52]

When Johnson learned that Robb was willing to sell Company stock, Johnson sent Robb an email calculating that the Robb Companies owed Bond Purchase $272,000 in principal and $17,200 in interest under the Notes. Johnson offered to buy the 23,007 shares for $10 per share in satisfaction of the debt.[53] Robb then went to Usera, and the two reached an agreement in principle that the Company would purchase the 23,007 shares for $11 per share, which was $2–3 less than the book value of the stock.[54] To consummate the sale, the Company asked Robb to provide the pay-off amount owed under the Notes to allow the Company to purchase the shares free and clear of any liens.[55]

---

[49] JX-11 at 1.

[50] *Id.* at 1–4.

[51] *Id.* at 6.

[52] *Id.* at 5.

[53] *Id.* at 6–7.

[54] *Id.* at 7.

[55] *Id.*

In September 2015, Robb requested from Bond Purchase the pay-off information, which Bond Purchase failed to provide.[56] Instead, Johnson directed Bond Purchase to declare a default under the Notes and accelerate payment of the debt.[57] Bond Purchase notified Robb that it was pursuing a foreclosure sale of his companies' shares.[58] The day before the sale was scheduled, on December 14, 2015, Bond Purchase provided Robb with inflated pay-off statements that had been prepared at Johnson's direction, refusing to accept a lower amount.[59]

At the foreclosure sale, DEW, LLC ("DEW"), purportedly purchased 17,765 of the shares for $7 per share, although DEW was not formed until two days after the sale. The sale of the remainder of the collateral was stayed by a bankruptcy court.[60] DEW is owned by David Watson ("D. Watson"), Johnson's longtime friend and associate and C. Watson's father.[61] Johnson maintained a "cheat sheet" at the time to keep track of the Company shares he beneficially owned, and listed DEW's 17,765 shares on that sheet.[62]

The Robb Companies filed suit against Johnson in Missouri state court. On November 27, 2017, the Missouri court found that, without any "justification other than a desire to gain control of Clay County Savings Bank by acquiring the CCSB Financial stock

---

[56] *Id.* at 8.

[57] *Id.* at 8–9.

[58] *Id.* at 9.

[59] *Id.* at 12–13.

[60] *Id.* at 14–15.

[61] *Id.*

[62] *Id.* at 15.

pledged by plaintiffs at seventy cents on the dollar, Johnson was successful in interfering with the plaintiffs' ability to sell their stock or refinance the debt that was legitimately due."[63]  On June 25, 2019, the Missouri Court of Appeals affirmed those findings.[64]

### E.    Johnson Is Notified Of A CIBCA Violation.

On February 19, 2019, the Federal Reserve Bank of Kansas City sent Johnson a letter notifying him that a then-recent transfer of Company shares had resulted in a violation of the Change in Bank Control Act ("CIBCA").[65]  Specifically, the Federal Reserve informed Johnson that

> we understand that you transferred 30,000 shares of CCSB stock to MLake 70, LLC (MLake), in order to bypass the 10 percent voting limitation per shareholder imposed by the Certificate of Incorporation of CCSB.  This transfer of stock resulted in a violation of the CIBCA.  The goal of our ownership review is to identify all parties presumed to be acting in concert as members of the Johnson Control Group, resolve the violations in a single Change in Control filing, and prevent future violations and untimely filings under the CIBCA.[66]

After completing its review, the Federal Reserve gave Johnson two options.  The first was that he could submit filings requesting that certain of his identified affiliates be allowed to retain control of their Company stock and become approved members of the Johnson Control Group.[67]  These affiliates included Totta, as a managing member of Park's

---

[63] *Id.* at 34.

[64] JX-109 at 17–21.

[65] JX-14 at 1.

[66] *Id.*

[67] JX-16 at 1.

owner, and C. Watson, as a managing member of MLake 70 LLC ("MLake 70").[68] In addition, any immediate family members of the managing members of Park's owner and MLake 70 who owned or controlled CCSB stock would have to file the same request.[69] The other option was that Johnson could simply unwind the violative transaction.[70]

The record does not reveal what occurred after these communications. The Board did not learn of this interaction with the Federal Reserve until discovery in this action.[71]

### F.      Usera's Cheat Sheet And The Insider Stock Sales

Johnson is not the only Company stockholder who has kept a so-called "cheat sheet" tracking Company stock ownership; Usera has as well. Usera's cheat sheet, which he updates monthly, tracks the share ownership of directors, officers, employees, and "friends" who Usera believes would support Company management in an election.[72] The cheat sheet includes calculations of "# of shares needed for 50+1 Control" and "# of shares to repurchase for 50+1 Control."[73] Usera testified at his deposition that he initially created the cheat sheet to more easily report insider holdings for regulatory agencies, but that since the Company is no longer registered with the SEC, it now serves the additional purpose of

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *See* Dkt. 66 ("Def.'s Answering Trial Br.") at 46–47.

[72] JX-90; Usera Dep. Tr. at 15:1–17:2.

[73] JX-90.

tracking friendly stockholdings that Usera expects would vote for the Board's nominees in a contested election.[74]

From November 1, 2016 to January 29, 2021, Usera brokered 23 transactions through which the Company, its directors, officers, and their family members bought stock from stockholders whom Usera considered friendly.[75] These transactions included eight repurchases in which the Company bought 21,710 shares for $305,000 from Company directors, officers, and their family members who wished to sell their stock.[76] The other fifteen transactions involved private, undocumented sales in which Company directors, officers, and their family members purchased 22,945 shares of stock, including 16,985 by directors Jones, Feess, and Freeman.[77] Most of the sellers in these transactions appeared in Usera's cheat sheet as employees or friends.[78]

Feess testified at his deposition about how these private transactions were generally conducted. He testified that, for every transaction in which Feess participated, Usera contacted him, advised him that there was a seller, and arranged for Feess to buy the

---

[74] Usera Dep. Tr. at 17:10–19:10.

[75] JX-82 at Resp. 10.

[76] *Id.*

[77] *Id.*

[78] *See generally* JX-82 at Resp. 10; JX-90 at 093019 (Ron and Karen Venable selling 10,600 shares on 9/11/2019); *id.* at Tab 123108 (former director Keith Oberkrom selling 7,060 shares on 2/22/2019); *id.* at Tab 022817 (John and Joseph Crossett selling 1,333 shares combined on 3/9/2017); *id.* (John May selling 2,662 shares on 6/1/2017); *id.* at Tab 103118 (William Davis selling 3,500 shares on 5/1/2018); *id.* at Tab 043019 (Paul Billings Trust and Jeff Billings selling 1,120 shares combined on 5/13/2019); *id.* at Tab 103118 (Jennifer Harrison selling 250 shares on 6/6/2019).

stock.[79]  There were no contracts documenting these sales and Feess paid for the shares he purchased using his personal bank account.[80]

## G. The 2020 Election And Related Litigation

Two director seats were up for election at the Company's January 23, 2020 annual meeting.  Park nominated Totta and Morrissey for those seats; Coltman and McKinley stood for reelection.[81]

In connection with the 2020 meeting, Johnson disclosed that he owned 76,235 Company shares.  Voluntarily subjecting himself to the Voting Limitation, he stated that he could only vote 74,200 of those shares.[82]  In connection with this statement, Johnson sought clarification on how it would operate, asking the Board to advise on how the Board "implements and applies the 10% limit" and how Company shares held under the employee stock ownership plan and profit-sharing plan are voted and treated under the Voting Limitation.[83]  The Board did not respond.[84]

At the 2020 meeting, Usera declared that he beneficially owned 76,324 shares.[85]  He also voluntarily subjected himself to the Voting Limitation and only voted 74,200 of his shares.

---

[79] Feess Dep. Tr. at 68:10–79:15.

[80] *Id.*

[81] PTO ¶¶ 17–18.

[82] *Id.* ¶ 19.

[83] JX-18 at 1.

[84] Johnson Dep. Tr. at 168:24–169:19.

[85] JX-19 at 1.

Thus, the votes of 4,159 total shares beneficially owned by Johnson and Usera were not counted at the 2020 meeting.[86]

DEW was listed as the record holder of and voted 17,765 shares at the 2020 annual meeting in favor of Totta and Morrissey, all of which were counted and none of which were included with Johnson's shares under the Voting Limitation.[87]

According to the inspector of election's 2020 report, Totta and Morrissey lost the 2020 election, the results of which are subject to a separate litigation in this court that has been stayed in favor of parallel litigation filed by Totta in Missouri.[88]

## H. The Lead-Up To The 2021 Election

On September 10, 2020, Park nominated Totta, Morrissey, and C. Watson for the three directorships that were up for election at the 2021 annual meeting.[89] On September 15, 2020, Park made a tender offer to certain Company stockholders to purchase up to 30,000 Company shares for $16.33 per share.[90] This tender offer was the latest of many that Park and Johnson had made over the years, on a nearly annual basis.[91] Park's letter stated that "[w]e continue to offer to buy shares in the Company because we believe the

---

[86] JX-23 at 1.

[87] PTO ¶ 23.

[88] *See* C.A. No. 2020-0230-KSJM, Dkt. 59 (Order Granting Stay) ¶¶ 4–5, 12–14.

[89] PTO ¶ 24.

[90] JX-28 at 1.

[91] Johnson Dep. Tr. at 17:24–19:2.

Company must: 1. Add new board members; 2. Make improvements to management and profitability; and 3. Consider selling the bank."[92]

On September 16, 2020, the Board set the Record Date for the 2021 annual meeting.[93] The Board also retained Stephanie Kalahurka of Fenimore, Kay & Harrison LLP as the inspector of elections for the 2021 annual meeting.[94] Kalahurka and her firm have served as the Company's counsel since 2014, and in 2020, the Board identified her as "primary legal counsel for fiscal year 2020."[95]

On October 1, 2020, the Company sent letters to Johnson and his wife and two other non-party stockholders seeking information about their beneficial stock ownership for annual reporting purposes.[96] The letters requested the information as of September 30, 2020, and asked the stockholders to update the information no later than 15 business days after the Record Date, which had not yet been announced.[97] The letters specifically referenced the definitions of "affiliate" and "beneficial ownership" in Article 4(C) of the Company's certificate of incorporation, and asked for, among other things, the number of shares which the recipients held as a "group pursuant to any agreement, arrangement or

---

[92] JX-28 at 1.

[93] PTO ¶ 25.

[94] *Id.*

[95] *Id.* ¶¶ 25–26.

[96] *Id.* ¶ 27; *e.g.*, JX-31. The other two stockholders later responded to Usera and indicated that they had made no agreements to vote their shares. JX-54 at 1.

[97] JX-31; JX-30; JX-32.

17

understanding (whether written or unwritten) for the purpose of acquiring, holding, voting or disposing of any shares of Company stock."[98]

On October 21, 2020, the Board's nominating committee met to discuss director nominations for the 2021 annual meeting.[99] Usera and Jones are not on the nominating committee, but attended the entire meeting, including the discussion of Park's nominees.[100] The committee nominated Usera, Jones, and Freeman.[101]

The Company sent a follow-up letter to Johnson and his wife on November 2, 2020, that was nearly identical to the first batch of letters but bore a legend reading "Second Request."[102]

At some point in November 2020, Johnson approached D. Watson and asked whether D. Watson would be interested in some Company shares at the market price. D. Watson responded positively.[103] On November 24, 2020, Johnson emailed Totta and others at Maxus Properties, writing, "I am going to have David watson [sic] buy 19500 shares from me ASAP . . . *want to beat the record date*."[104]

---

[98] JX-31; JX-30; JX-32

[99] PTO ¶ 28.

[100] *Id.*

[101] *Id.*

[102] *Id.* ¶ 29; JX-36 at 1.

[103] D. Watson Dep. Tr. at 36:12–37:7.

[104] JX-39 at 1–2 (emphasis added).

In that same November 24, 2020 email, Johnson instructed Totta to figure out how to complete the transaction.[105] Totta emailed D. Watson's family wealth planning advisors the next day asking for help on how best to handle the transaction, and told them that the shares needed to be "moved <u>before</u> the end of business on December 1st."[106] The wealth advisors responded that day, asking whether Totta wanted the shares moved into D. Watson's revocable trust account or DEW's account, and Totta asked them to transfer the shares to DEW's account.[107]

On November 25, 2020, Johnson and D. Watson, on behalf of DEW, signed a purchase and sale agreement pursuant to which Johnson conveyed 19,500 shares to DEW for $16.42 per share, for a total transaction price of $320,190.[108] The share transfer was

---

[105] *Id.*

[106] JX-40 at 3 (emphasis in original). The Company argues that Totta's use of December 1 as a deadline implies that Johnson and Park knew the Record Date before it was announced, but Totta testified at her deposition that they merely knew that the Board generally sets the record date in the first week of December. *See* Def.'s Answering Trial Br. at 22 n.77; Totta Dep. Tr. at 121:18–20. This testimony is supported by the fact that the Record Date was December 3, not December 1.

[107] JX-40 at 1.

[108] PTO ¶ 30. The purchase and sale agreement refers to Johnson and his wife as the "Assignor" or "Seller" and DEW as the "Assignee" or "Buyer." JX-44 at 3. The Company argues that use of the "assign" language is evidence that the sale to DEW was not at arms' length. Def.'s Answering Trial Br. at 22–23; Trial Tr. at 80:23–81:12. Defendant is correct that, under Delaware law, "assign" has a meaning indicating that something less than the full batch of ownership rights is being transferred. *See Hawkins v. Daniel*, --- A.3d ---, 2022 WL 997752, at *29–31 (Del. Ch. Apr. 4, 2022) (discussing meaning of "assignee" and its relationship to the concept of "transfer"). Having reviewed the purchase and sale agreement itself, however, it is clear that the contract uses the term "Assignor" interchangeably with "Seller" and the same for "Assignee" and "Buyer." JX-44 at 3. Outside of that minor oddity, the purchase and sale agreement appears to the court to be

19

initiated on November 25, 2020, and completed on November 27, 2020.[109] On December 2, 2020, D. Watson wired the purchase amount from his line of credit at First Missouri Bank to Johnson's account at the same.[110] Johnson failed to report the sale on his original tax returns for 2020, but later amended them to include the sale.[111]

On December 4, 2020, the Company sent Johnson a "Third Request" for him to report his beneficial stock ownership, which was substantially identical to the first two but disclosed the Record Date as being the day before.[112]

---

just that: a purchase and sale agreement that, like most others, did not grant the seller any retained rights in the transferred shares.

[109] PTO ¶ 31.

[110] *Id.* ¶ 32, JX-47. Just before trial, First Missouri Bank produced some internal emails concerning the approval of D. Watson's loan applications. The emails reflect that Johnson abstained on the vote of whether to approve Johnson's loans. In response to one such request, in November 2018, Johnson wrote "I abstain . . . collateral is my company." JX-113 at 6. The Company argues that this evidence compels the conclusion that the sale to DEW was not arm's-length, because it demonstrates that the consideration for the sale was money from a line of credit at a bank Johnson controls on which the bank would never foreclose because the collateral for that line of credit was one of Johnson's companies. Trial Tr. at 83:6–84:19. In the Company's view, Johnson effectively paid himself for his own shares. The court is not convinced. As Plaintiffs point out, D. Watson and Johnson have co-invested in numerous projects over their more than four decades of acquaintance. D. Watson Dep. Tr. at 16:9–12, 17:6–12. The loan submission documents are not in evidence, the line of credit documents are not in evidence, and without more, the court is not prepared to find anything more than Johnson abstained from voting on a loan submission on D. Watson's line of credit in November 2018 because, at the time, the collateral was a company in which Johnson was at least a partial investor.

[111] *Compare* JX-40, *with* JX-87; *see also* Johnson Dep. Tr. at 113:25–114:22; Trial Tr. at 100:16–22.

[112] JX-43.

20

On December 15, 2020, Johnson wrote to the Federal Reserve Bank of Kansas City to provide notice of the 19,500-share transaction with DEW.[113] The letter stated, in part:

> I recently sold a total of 19,500 shares of CCSB (which is less than 3% of CCSB's outstanding shares) to DEW LLC which is owned by David Watson and wanted to provide notice of the sale for your records. DEW LLC owned shares of CCSB before this purchase, but DEW LLC is not part of the Johnson Control Group. Mr. Watson is a retired business acquaintance who owns less than a 6% ownership interest in Maxus Realty Trust, which has hundreds of shareholders . . . .
>
> The shares were sold in an arms' length transaction for fair market value ($16.42 per share; see CCSB web page attached). Neither Mr. Watson nor any member of the Johnson Control Group is a party to any agreement, contract, understanding, relationship, or other arrangement regarding the acquisition, voting, or transfer of voting securities of CCSB.[114]

The Federal Reserve did not object to the sale, conclude that DEW was part of the Johnson Control Group, conclude that Johnson and DEW were acting in concert, or ask for any other information from Johnson after the sale to DEW.[115] D. Watson testified that no government agency has ever informed him that he and Johnson are acting in concert, part of a control group, affiliates under the rules and regulations of the Securities and Exchange Act of 1934, or that they are beneficial owners of each other's stock.[116]

---

[113] PTO ¶ 33.

[114] *Id.*

[115] Johnson Dep. Tr. at 170:4–171:3.

[116] D. Watson Dep. Tr. at 117:24–118:22.

On December 17, 2020, Johnson provided the Company with a statement of ownership concerning his stock which stated that he beneficially owned 87,348 shares as of September 30, 2020, and 73,948 shares as of December 3, 2020.[117]

On January 18, 2021, Brian Boos of the Wallace Saunders law firm, who represents Usera in his pending litigation against Johnson in Missouri, sent a letter to DEW, D. Watson, and Canvas Wealth Advisors requesting information about their beneficial stock ownership and relationships with other stockholders.[118] While the letter stated that Wallace Saunders was retained to assist the Board's investigation into beneficial stock ownership, Usera later clarified that the extent of the firm's involvement was to send that letter and similar ones.[119]

In the lead-up to the 2021 annual meeting, Usera kept a close eye on proxy votes as they came in. In the weeks before the election, Broadridge[120] began sending Usera daily vote reports, and Usera contacted Broadridge to ask about stockholders he believed had voted but whose votes did not appear on the reports.[121] When a stockholder's vote appeared for Park's nominees that Usera believed should have appeared for the Board's nominees, Usera contacted Broadridge and instructed them to update the vote totals, or he contacted

[117] PTO ¶ 34.

[118] *Id.* ¶¶ 36–37; JX-55.

[119] JX-55; Usera Dep. Tr. at 99:11–17.

[120] According to Usera's deposition testimony, Broadridge is a company that acts as "the intermediary for brokerage accounts" and would provide daily spreadsheets "of the brokerage votes," which is consistent with the communications between them. Usera Dep. Tr. at 87:18–23; JX-57.

[121] JX-57 at 1–3.

the stockholder directly.[122] When a stockholder who Usera expected to vote did not vote, Usera contacted Broadridge for the stockholder's contact details and reached out to the stockholder directly.[123]

The Board held a meeting on January 20, 2021.[124] While this was not the first Board meeting since Johnson's letter providing his beneficial stock ownership, it appears to have been the first at which the letter was discussed.[125] The minutes reflect that Usera stated that Johnson's letter provided incomplete share ownership and that he had "evidence to believe that Mr. Johnson may be acting in concert with others."[126] The minutes noted an increase in share ownership of 19,500 shares by Canvas Wealth Advisors, which the Board believed to be beneficially owned by D. Watson, and because C. Watson was D. Watson's son, the Board concluded that Johnson's "shares were transferred to avoid the 10% beneficial ownership rule and that the individuals may be acting in concert."[127]

The Board neither informed Johnson that it considered his December 17, 2020 letter deficient nor asked him for any follow-up information.[128] At their depositions, neither Feess nor Jones could explain what information was missing from Johnson's letter.[129] The

---

[122] *E.g.*, JX-60 at 1; Usera Dep. Tr. at 81:19–22.

[123] *E.g.*, JX-62 at 1.

[124] JX-56.

[125] PTO ¶ 35.

[126] JX-56 at 1.

[127] JX-56 at 2.

[128] Usera Dep. Tr. at 77:14–20.

[129] Feess Dep. Tr. at 45:16–46:2; Jones Dep. Tr. at 36:13–22.

Board did not investigate whether any other stockholder was potentially acting in a manner that could justify invoking the Voting Limitation, including Usera.[130] The Company claims that this is because Usera "self-reports" his share ownership. As mentioned above, however, Usera has failed to include his daughter's shares with his own when calculating his beneficial ownership.[131]

D. Watson responded to the January 18, 2021 letter from Boos through his counsel by letter dated January 27, 2021, stating that DEW owned 37,175 shares, that DEW did not have any agreement to vote Company shares, and that DEW was not an affiliate of any other Company stockholder.[132] The letter also stated that D. Watson intended to vote DEW's shares for his son, C. Watson.[133]

## I.     The Day Of The January 28, 2021 Board Meeting

The Board met at 8:55 a.m. local time the morning of the Company's 2021 annual meeting.[134] The minutes reflect that the "purpose of this meeting was to discuss whether stockholders were acting in concert, whether they were in violation of the 10% beneficial ownership rule . . . and whether the Board of Directors was in a position to enforce its authority . . . at today's Annual Meeting."[135] The minutes and Usera's notes from the meeting indicate that the Board was presented with Johnson's December 17, 2020 letter,

---

[130] Feess Dep. Tr. at 36:3–12.

[131] Def.'s Answering Trial Br. at 26 n.94; Usera Dep. Tr. at 145:18–146:14.

[132] PTO ¶ 38.

[133] PTO ¶ 38; JX-64 at 1.

[134] JX-69. Most of the Board was there in person, but Durden attended by phone. JX-111.

[135] JX-69.

Boos' January 18, 2021 letter to D. Watson and DEW, and D. Watson's January 27, 2021 response.[136]

The meeting minutes and Usera's notes diverge in their account of what occurred at the meeting. The minutes indicate that the Board also discussed: additional facts that were previously brought to the Board's attention, including the transfer of 17,650 shares in the name of DEW, LLC to Fidelity Investment; Park's nomination letter; the Non-Objectional Beneficial Owner (NOBO) List; the fact that Johnson's letter identified shares he owned that were not on the NOBO List, and thus must be on the Objectional Beneficial Owners List, which the Company cannot access to verify ownership; and the *Robb* judgment.[137]

Usera's notes reflect only the discussion of the three communications previously mentioned and then finish with the Board's conclusion.[138] Plaintiffs argue that the discussion of the additional facts in the minutes never took place, but were rather a post-hoc addition to the minutes to make it appear that the Board engaged in a more thorough deliberation than it had.[139] Plaintiffs point out that Feess testified that he had no familiarity with the *Robb* judgment, despite the fact that Usera had been discussing the *Robb* judgment in Board meetings since 2017.[140]

---

[136]*Id.*; JX-75; Jones Dep. Tr. at 43:21–24.

[137] JX-69.

[138] JX-75.

[139] Dkt. 62, ("Pls.' Opening Trial Br.") at 33–34.

[140] Feess Dep. Tr. at 54:15–17; JX-12.

The parties do not dispute that, as the minutes reflect, the Board concluded its discussion by determining that Johnson, his wife, D. Watson, C. Watson, Morrissey, and Totta were "acting in concert in order to get their alternate slate elected" in what the Board considered to be a violation of the Voting Limitation.[141] The minutes then state that "a motion was made, seconded and carried to hand deliver a letter to" Kalahurka in her capacity as inspector of election.[142]

The letter reiterated the Board's conclusion, supposedly reached at that meeting, that Johnson and the other identified persons were acting in concert in violation of the Voting Limitation.[143] The letter instructed Kalahurka that "during the tabulation of votes, unless you have been provided evidence to the contrary, the Board" had determined that votes in favor of Park's nominees "in excess of 10% owned by the aforementioned parties are not valid votes and should not be counted at the Annual Meeting of the Shareholders to be held today, January 28, 2021."[144]

The letter included a table similar to the following:[145]

| Shareholder/Broker | Beneficial Owner(s) | Source | Number of Shares |
|---|---|---|---|
| Charles Schwab | David Johnson | Letter to the Corporate Secretary dated 12/17/2020 | 28,025 |
| National Financial Services LLC | David L Johnson and Sandra L. Castetter | Letter to the Corporate Secretary dated 12/17/2020 | 42,525 |

---

[141] JX-69 at 3.

[142] *Id.*

[143] JX-71 at 1.

[144] *Id.*

[145] *Id.*

26

| | | | |
|---|---|---|---|
| National Financial Services LLC (Canvas Wealth Advisors) | David E Watson | Letter to the Corporate Secretary dated 1/27/2021 | 37,150 |
| National Financial Services (MLake LLC) | Chase Watson | Nomination Letter from Park GP | 500 |
| Unknown | Laurie Morrissey | Nomination Letter from Park GP | 100 |
| Wells Fargo (Park GP) | David Johnson and DeAnn Totta | Letter to the Corporate Secretary dated 12/17/2020 | 1,398 |
| Park GP, Inc. | David Johnson and DeAnn Totta | Registered Shares | 2,000 |
| DEW LLC | David E Watson | Registered Shares | 25 |
| Total | | | 111,723 |
| | | | |
| Outstanding Shares | | | 743,071 |
| 10% | | | 74,307 |
| | | | |
| Amount in Excess of 10% | | | 37,416 |

Notably, the letter instructed Kalahurka not to count a total of 37,416 votes, including *all* of DEW's 37,175 shares, not just the 19,500 that DEW purchased from Johnson in November. The Board did not conduct an investigation into whether any other stockholder or group of stockholders, including insiders such as Usera, were acting in concert for purposes of applying the Voting Limitation.[146] Kalahurka performed no investigation of her own into any stockholder's ownership, instead relying entirely on the Board's letter and Usera's self-reported stockholdings.[147]

---

[146] Feess Dep. Tr. at 36:8–12.

[147] Kalahurka Dep. Tr. at 93:5–23, 94:18–25.

The Company's 2021 annual meeting was called at 10:00 a.m. local time, immediately after the Board meeting.[148] According to the minutes, Usera stated that

> As of the record date, only he, Mario Usera, had declared ownership of over 10%, and as such, the 10% limit would be applied with respect to shares that he beneficially owns. However, if the outcome of this election was such that a different outcome would result if the Board of Directors were to determine that others are acting in concert, under an agreement or under an understanding such that the 10% beneficial rule should be applied to others, this would cause a delay in the tabulation of votes and the Board of Directors would exercise its powers under the Certificate of Incorporation to require/request additional information from stockholders who have voted in order to fulfill its duties and responsibilities under the Certificate of Incorporation.[149]

There is no evidence that Usera or the Board informed the stockholders that they had instructed Kalahurka not to count the 37,416 votes for Park's nominees before the meeting. Usera called a recess so that Kalahurka could tabulate the votes.[150]

Jones then read from the Certificate and Report of the Inspector of Election, stating that there were 743,071 Company shares outstanding as of the Record Date, and that 41,550 shares had been determined to the ineligible under the Voting Limitation.[151] Jones stated that the Board's nominees, Freeman, Usera, and herself, had each received 359,336 votes

---

[148] JX-70 at 1.

[149] *Id.* at 1–2.

[150] *Id.* at 3.

[151] *Id.*

while Park's nominees, Totta, C. Watson, and Morrissey, had each received 322,859 shares.[152] Thus, the Board announced that its nominees had won the election.[153]

Kalahurka testified that, without the Board's instruction, she would have counted 360,275 votes in favor of Park's nominees, and the individual Plaintiffs would have won the election.[154] On the bottom of page 1 of the Certificate and Report of the Inspector of Election, Kalahurka handwrote the following: "* For purposes of the number of shares determined to be ineligible pursuant to Article Fourth, Section C of the Certificate of Incorporation, the Inspector of Election relied solely upon the letter from the Board of Directors attached hereto as Exhibit A, and other attached information."[155]

### J.      This Litigation

Plaintiffs filed their complaint in this action on February 26, 2021, seeking declaratory judgment under 8 *Del. C.* § 225 that the Board's instruction to the election inspector was improper and that Park's nominees were each elected to the Board.[156]

## II.     LEGAL ANALYSIS

Plaintiffs seek a declaration that the 37,416 votes should not have been excluded when tabulating the 2021 election results. If Plaintiffs prevail, then Totta, Morrissey, and C. Watson were elected to the Board, and Usera, Freeman, and Jones were not. This

---

[152] *Id.* at 3–4.

[153] *Id.* at 4.

[154] PTO ¶ 44; Kalahurka Dep. Tr. at 91:10–17.

[155] JX-73 at 1 (underlining in original).

[156] Dkt. 1.

decision first resolves the threshold issue concerning the applicable analytical framework for resolving the parties' dispute, which results in the conclusion that the Board's actions must be tested twice—first, to determine whether the action was legally compliant with the Voting Limitation and, second, under the enhanced scrutiny test of *Blasius*. This decision then resolves both steps of the test in favor of Plaintiffs.

## A. Standard Of Review

Under Delaware law, director actions are tested both for legal authorization and for equity.[157] The Delaware Supreme Court recently articulated the approach as follows:

> This Court has long recognized that "inequitable action does not become permissible simply because it is legally possible." Under Delaware law, "director action[s] [are] 'twice-tested,' first for legal authorization, and second [for] equity." "Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with equitable principles of fiduciary duty."[158]

The first layer of analysis asks whether board action was legally authorized and looks to whether the conduct was permitted under positive law and the corporation's

---

[157] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439–40 (Del. 1971).

[158] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 96–97 (Del. 2021) (first quoting *Schnell*, 285 A.2d at 439, then quoting *In re Invs. Bancorp., Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017), then quoting *Sample v. Morgan*, 914 A.2d 647, 664 (Del. Ch. 2007)).

constitutive documents.[159]  A stockholder plaintiff challenging a board action for legal validity bears the burden of proof.[160]

In this case, the question of legal authorization asks whether the Board correctly applied the Voting Limitation, and Plaintiffs bear the burden of proof.

The second layer of analysis asks whether board action was equitable and looks to whether the directors comprising the board complied with their fiduciary obligations. When determining whether a fiduciary breached an equitable obligation, a court "evaluates the question . . . through the lens of . . . several possible standards of review."[161]  "Entity law generally uses three standards of review: a default standard of review that is highly deferential and known as the business judgment rule; an intermediate standard of review

---

[159] *See Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and (iv) other entity-specific contractual agreements, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement."); *see*, *e.g.*, *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *33 (Del. Ch. June 11, 2020) (noting that the board action was taken pursuant to a provision in the company's certificate of incorporation before moving on to the second step of the twice-tested framework).

[160] *See*, *e.g.*, *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *8, 16 (Del. Ch. Feb. 14, 2022) (allocating the burden to the stockholder-plaintiff in a breach of contract claim challenging board action before noting that director-defendants bear the burden of demonstrating reasonableness under enhanced scrutiny review).

[161] *Metro Storage Int'l LLC v. Harron*, --- A.3d ---, 2022 WL 1404359, at *18 (Del. Ch. May 4, 2022) (collecting cases).  Recently, the Delaware Supreme Court clarified that this court may be required to evaluate fiduciary conduct under multiple equitable standards. *See Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960–63 (Del. 2021).

31

known as enhanced scrutiny; and an onerous standard of review known as the entire fairness test."[162]

When director conduct "'affect[s] either an election of directors or a vote touching on matters of corporate control,' the board must justify its action under the enhanced scrutiny test."[163] This is because "[s]hareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm."[164] Disputes concerning the stockholder franchise frequently arise in the context of a proxy contest, where directors "confront a structural and situational conflict because their own seats are at risk,"[165] and "the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors."[166]

In this case, the Board's application of the Voting Limitation must pass muster under the test articulated in *Blasius Industries, Inc. v. Atlas Corp.*[167] In a typical *Blasius* case, the directors are named as defendants and bear the burden of proving that their actions were equitable.[168] Here, the directors have not been named as defendants, and the

[162] *Metro Storage*, 2022 WL 1404359, at *18 (citing *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442 (Del. Ch. 2011)).

[163] *Pell v. Kill*, 135 A.3d 764, 786 (Del. Ch. 2016) (quoting *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 811 (Del. Ch. 2007)).

[164] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012).

[165] *Pell*, 135 A.3d at 786.

[166] *Reis*, 28 A.3d at 457.

[167] 564 A.2d 651 (Del. Ch. 1988)

[168] *Id.* at 661 (holding that, when enhanced scrutiny applies to "board acts done for the primary purpose of impeding the exercise of stockholder voting power," "the board bears

Company has taken on the mantle of defending the Board's actions. The Company, therefore, bears the burden of proof.

The Company asks this court to take a totally different analytical approach, testing the Board's action only once under a highly deferential standard. The Company bases its argument, in the first instance, on the Conclusive-And-Binding Provision. The Company then seeks to bolster its position by cursorily cobbling together a series of legal propositions based loosely on case law. The Company's argument fails.

Recall that the Conclusive-And-Binding Provision purports to render "conclusive and binding upon the Corporation and its stockholders" "any constructions, applications, or determinations made by the Board of Directors pursuant to this section in good faith and

---

the heavy burden of demonstrating a compelling justification for such action"); *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987) ("When the election machinery appears, at least facially, to have been manipulated, those in charge of the election have the burden of persuasion to justify their actions."); *Pell*, 135 A.2d at 787 ("When tailored for reviewing director action that affects stockholder voting, enhanced scrutiny requires that the defendant fiduciaries bear the burden of proving (i) that 'their motivations were proper and not selfish,' (ii) that they 'did not preclude stockholders from exercising their right to vote or coerce them into voting a particular way,' and (iii) that the directors' actions 'were reasonable in relation to their legitimate objective.'" (citing *Mercier*, 929 A.2d at 810–11)); Craig W. Palm & Mark A. Kearney, *A Primer on the Basics of Directors' Duties in Delaware: The Rules of the Game (Part II)*, 42 Vill. L. Rev. 1043, 1078 (1997) ("Once the challenging shareholder shows that the board has manipulated shareholder voting rights in order to thwart those rights, the burden shifts to the directors to show that the board had a compelling justification for infringing upon the effective exercise of the shareholder franchise.").

on the basis of such information and assistance as was then reasonably available."[169] The last portion of this quote effectively tracks the business judgment rule.[170]

In the Company's view, the Conclusive-And-Binding Provision makes the Board's determination binding not just on the Company and its stockholders, but also the court. In effect, the Company argues that Article FOURTH forecloses judicial review for legal validity *and* under otherwise applicable equitable standards and requires the court to evaluate the determination under the business judgment rule.[171]

The Company's argument contravenes fundamental principles of Delaware corporate law. In essence, the Company asks the court to hold that a corporate charter may alter the directors' fiduciary obligations and the attendant equitable standards a court will apply when enforcing those obligations. The Company would treat a corporate charter like the constitutive agreement that governs an alternative entity.

---

[169] Certificate of Inc. art. 4(C)(6).

[170] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under Section 141(a). It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." (citation omitted)). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).

[171] Def.'s Answering Br. at 35–38.

Fiduciary duties arise in equity and are a fundamental aspect of Delaware law. The constitutive agreements that govern an entity can only eliminate or modify fiduciary duties and the attendant judicial standards of review to the extent expressly permitted by an affirmative act of the Delaware General Assembly. The General Assembly has granted broad authorization to modify or eliminate fiduciary duties and attendant standards of review in some types of entities. The General Assembly has granted only limited authority to corporations.

"[T]he principle of fiduciary duty, stated most generally, [is] that one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner," and that while there are other aspects, "the central aspect of the relationship is, undoubtedly, fidelity in the control of property for the benefit of another."[172] The persons who comprise the governing body of an entity act in a fiduciary capacity. Directors of Delaware corporations occupy a fiduciary role as a result of their statutory authority to manage the business and affairs of the corporation.[173] This position of trust

---

[172] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991); *see also Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689, 690 (Del. Ch. 1973), *rev'd on other grounds*, 311 A.2d 870 (Del. 1973) ("A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another. The relationship connotes a dependence."); *Lank v. Steiner*, 213 A.2d 848, 852 (Del. Ch. 1965) ("A fiduciary relationship is defined as a situation 'where one person reposes special confidence in another, or where a special duty exists on the part of one person to protect the interests of another, or when there is a reposing of faith, confidence, and trust, and the placing of reliance by one person on the judgment and advice of another.'" (citation omitted)).

[173] *See* 8 *Del. C.* § 141(a); *Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281, 1291 (Del. 1998) (noting that a corporate board of directors has "statutory authority to manage

carries with it concomitant duties of care and loyalty "historically rooted in ancient notions of trust and agency law."[174] The persons who comprise the governing bodies of other types of entities occupy a fiduciary role for similar reasons.[175]

The Constitution of 1897 retains the distinction between law and equity, and the General Assembly has empowered this court to hear and determine all matters and causes in equity.[176] The duties that corporate directors and officers "owe to shareholders with respect to the exercise of their legal power over corporate property supervene their legal

---

the corporation under 8 *Del. C.* §141(a) and [a] concomitant fiduciary duty pursuant to that statutory mandate").

[174] Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1470 (2005).

[175] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014) ("By default, the traditional fiduciary duties applicable to corporations apply to limited liability companies."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("[T]here has never been any serious doubt that the general partner of a Delaware limited partnership owes fiduciary duties."); *Dolby v. Key Box "5" Operatives, Inc.*, 1994 WL 507881, at *5 n.4 (Del. Ch. Sept. 8, 1994) ("[T]he partners in a general partnership also owe fiduciary duties to one another."); *Tigani v. Tigani*, 2021 WL 1197576, at *13 (Del. Ch. Mar. 30, 2021) ("Under default principles of Delaware law, a trustee owes fiduciary duties to a beneficiary.").

[176] Del. Const. of 1792 art. VI; 10 *Del. C.* § 341; *DuPont v. DuPont*, 85 A.2d 724, 729 (Del. 1951) ("We conclude, therefore, that Section 17 [of the Constitution of 1897] is not an authorization to the Legislature to restrict Chancery jurisdiction to less than it was in 1792. We think the Constitutions of 1792, 1831 and 1897 intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity."); *Glanding v. Indus. Tr. Co.*, 45 A.2d 553, 558–59 (Del. 1945) ("It cannot be said too forcefully that the general powers of the Court of Chancery refers to that complete system of equity as administered by the High Court of Chancery of Great Britain, and a proper interpretation of the constitutions of this State lead to but one conclusion; that is, that the Court of Chancery shall continue to exercise that complete system of equity jurisdiction in all respects until the Legislature of this State shall provide otherwise, as by granting the exercise of a part of that jurisdiction exclusively to some other tribunal.").

36

rights, are imposed by equity and are recognized and enforced exclusively by a court of equity."[177]

This court fulfills the charge of enforcing fiduciary obligations through a system of judicially crafted standards of review. Those standards of review are conceptually distinct from the underlying fiduciary obligations that arise in equity and frame a standard of conduct by which the fiduciary should act. "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."[178]

In the hierarchy of law-making in a democratic regime, courts defer to legislatures. Within constitutional limits, the General Assembly can replace equity with statutory law.[179] For purposes of entity law, that means the General Assembly has the authority to eliminate or modify fiduciary duties and the standards that are applied by this court, or to authorize their elimination or modification through private ordering.

The General Assembly has granted broad authority to modify or eliminate fiduciary duties for certain types of Delaware entities. The Delaware Revised Uniform Partnership Act, the Delaware Revised Uniform Limited Partnership Act, the Delaware Uniform

---

[177] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del. Ch. 1987) (citation omitted).

[178] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

[179] *See In re Carlisle Etcetera LLC*, 114 A.3d 592, 602 (Del. Ch. 2015) (citing the Delaware Supreme Court's holding that "the General Assembly cannot enact legislation that reduces this court's jurisdiction below the constitutionally established minimum, unless there is an adequate remedy at law").

37

Limited Liability Company Act, and the Delaware Statutory Trust Act each allow investors

in these entities to expand, restrict, or eliminate fiduciary obligations.[180]

_____

[180] *See* 6 *Del. C.* § 15-103(f) ("A partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement; provided, that a partnership agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."); 6 *Del. C.* § 17-1101(d) ("To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing."); 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."); 12 *Del. C.* § 3806(c) ("To the extent that, at law or in equity, a trustee or beneficial owner or other person has duties (including fiduciary duties) to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument, the trustee's or beneficial owner's or other person's duties may be expanded or restricted or eliminated by provisions in the governing instrument; provided, that the governing instrument may not eliminate the implied contractual covenant of good faith and fair dealing."); *see also* 12 *Del. C.* § 3303(a) ("Notwithstanding any other provision of this Code or other law, the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary any laws of general application to fiduciaries, trusts, and trust administration, including, but not limited to, any such laws pertaining to: . . . (5) A fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument . . . provided, however, that nothing contained in this section shall be construed to permit the exculpation or indemnification of a fiduciary for the fiduciary's own wilful misconduct or preclude a court of competent jurisdiction from removing a fiduciary on account of the fiduciary's wilful misconduct. The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this section. It is the policy of this section to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments.").

Although the General Assembly has the power to wholesale displace the foundational role of equity in corporate law, it has not done so. There was some concern when Delaware adopted its corporate statute that it too broadly empowered management and too minimally restrained them, as Adolf Berle explained in his famous 1931 Harvard Law Review article articulating the twice-tested approach.[181] These concerns again flared after the 1967 revisions to the DGCL. *Schnell* allayed these concerns, cementing Delaware's adherence to Berle's "twice tested" framework.[182] More modern articulations of the principle clarify that the broad "latitude for substantial private ordering" granted by the DGCL is constrained by "statutory parameters and judicially imposed principles of fiduciary duty."[183] Put simply, Delaware corporations may not alter default fiduciary obligations unless authorized to do so by statute.

The General Assembly has acted cautiously to limit specific default rules of equity. The prime example is Section 102(b)(7), which allows corporations to adopt charter provisions that eliminate director liability for breach of the duty of care.[184] Section

---

[181] *See* Leo E. Strine, Jr., Lawrence A. Hamermesh, R. Franklin Balotti, & Jeffrey M. Gorris, *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 GEO. L.J. 629, 642 (2010) (citing Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049 (1931)).

[182] *See Schnell*, 285 A.2d at 439–40.

[183] *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996).

[184] *See* 8 *Del. C.* § 102(b)(7).

102(b)(7), however, only eliminates the availability of monetary damages; it does not eliminate the underlying duty of care nor the possibility of other forms of relief.[185]

Section 122(17) of the DGCL represents another restrained foray by the General Assembly into the realm of fiduciary principles. Section 122(17) permits corporations to renounce in advance "any interest or expectancy of the corporation in, or in being offered an opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities that are presented to the corporation or 1 or more of its officers, directors or stockholders."[186] As with Section 102(b)(7), Section 122(17) does not eliminate or limit the fiduciary duty of loyalty or the corporate opportunity doctrine that generally applies.[187] Section 122(17) merely authorizes a corporation to renounce

---

[185] *See* E. Norman Veasey et al., *Delaware Supports Directors With a Three-Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 403 (1987) ("[N]ew section 102(b)(7) does not eliminate the duty of care that is properly imposed upon directors."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 4.19[A] n.1097 (3d ed. Supp. 2019-2) ("Note also that Section 102(b)(7) allows the certificate of incorporation of a Delaware corporation to limit or eliminate the financial liability of directors for breach of the duty of care . . . . Such a limitation of liability does not, however, limit or eliminate the requirement that directors act with due care . . . ."); *see also Malpiede v. Townson*, 780 A.2d 1075, 1095 n.68 (Del. 2001); *Siegman v. Tri-Star Pictures, Inc.*, 1989 WL 48746, at *8 (Del. Ch. May 30, 1989) (denying motion to dismiss where a provision in a charter amendment could be construed to "eliminate or limit the liability of . . . directors for breach of their fiduciary duty of loyalty--a result proscribed by § 102(b)(7)"); 1 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 102.16, at 1-32–33 n.65 (7th ed. Supp. 2021-2) (quoting commentary to section 102(b)(7)) ("This provision would have no effect on the availability of equitable remedies, such as injunction or rescission, for breach of fiduciary duty.").

[186] 8 *Del. C.* § 122(17).

[187] *See* Lawrence A. Hamermesh, *The Policy Foundations of Delaware Corporate Law*, 106 Colum. L. Rev. 1749, 1782 n.150 (2006) ("By and large, the fiduciary duties of directors are nonwaivable, mandatory terms of the corporate contract. . . . The limited

40

certain business opportunities in advance. For this reason, Section 122(17) only authorizes waivers that are sufficiently narrow and specified. By contrast, a broad and non-specific waiver would go beyond what Section 122(17) authorizes by effectively limiting or eliminating the operation of the duty of loyalty.[188]

Another example of the role of equity is Section 152 of the DGCL, which governs stock issuances. That statute provides that "[i]n the absence of actual fraud in the transaction, the judgment of the directors as to the value of such consideration [for the stock issuance] shall be conclusive."[189] The court has observed, however, that even the broad language of Section 152 "does not provide a defense when the underlying transaction involves unfair self-dealing proscribed by equitable fiduciary duty concepts."[190] Fiduciary duties continue to apply.

---

exceptions--DGCL sections 102(b)(7) (permitting charter elimination of monetary liability of directors for breach of fiduciary duty except in specified circumstances) and 122(17) (permitting advance renunciation of corporate opportunities)--reflect the generally mandatory character of director fiduciary duties.").

[188] *See, e.g.*, *Alarm.com Hldgs., Inc. v. ABS Cap. P'rs, Inc.*, 2018 WL 3006118, at *8 n.46 (Del. Ch. June 15, 2018) (identifying issue posed by potential breath of waiver but noting that "[n]o one has challenged the scope of the waiver, and this decision provides no opportunity to opine on the validity of a broad and general renunciation of corporate opportunities, as contrasted with a more tailored provision addressing a specified business opportunity or a well-defined class or category of business opportunities"), *aff'd*, 204 A.3d 113 (Del. 2019); Lewis S. Black, Jr. & Frederick H. Alexander, *Analysis of the 2000 Amendments to the Delaware General Corporation Law* 3 (2000) ("The legislative synopsis [to Section 122(17)] explicitly provides that the amendment is not intended to change the application of fiduciary duties to the renunciation of corporate opportunities itself, which may still be subject to duty of loyalty issues.").

[189] 8 *Del. C.* § 152.

[190] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1235 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

The sharp contrast between the extent to which fiduciary duties can be eliminated through private ordering in the alternative entity context versus in the corporate context is one of the defining features that distinguishes alternative entities from corporations. Delaware decisions have cited this contrast.[191] Commentators have called attention to it repeatedly.[192] Yet even alternative entities retain mandatory features and contain domains

---

[191] *See also Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 849 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012) ("[T]he [LLC] Act lets contracting parties modify or even eliminate any equitable fiduciary duties, a more expansive constriction than is allowed in the case of corporations."); *Dieckman v. Regency GP LP*, 2016 WL 1223348, at *8 (Del. Ch. Mar. 29, 2016), *rev'd on other grounds*, 155 A.3d 358 (Del. 2017) ("But in stark contrast to the corporate context, in which fiduciary duties cannot be waived, a limited partnership may eliminate all fiduciary duties, including the duty of disclosure.").

[192] Mohsen Manesh, *Contractual Freedom Under Delaware Alternative Entity Law: Evidence from Publicly Traded LPs and LLCs*, 37 J. Corp. L. 555, 561–62 (2012) ("At most, corporations may eliminate managerial liability arising from breaches of the fiduciary duty of care and carve out limited exceptions to the corporate opportunity doctrine. Corporations cannot eliminate the substantive obligations of the fiduciary duty of care; cannot eliminate the substantive obligations of the fiduciary duty of loyalty or any liability arising from the breach of that duty; cannot eliminate the corporate opportunity doctrine altogether; cannot insulate all interested transactions from exacting entire fairness review; cannot eliminate so-called *Revlon* duties; and cannot protect managerial decisions from judicial scrutiny under the intermediate *Unocal* standard of review. Delaware alternative entities, however, can do all of these things."); Brent J. Horton, *Modifying Fiduciary Duties in Delaware: Observing Ten Years of Decisional Law*, 40 Del. J. Corp. L. 921, 949 (2016) (when describing *Hite Hedge LP v. El Paso Corp.*, 2012 WL 4788658 (Del. Ch. Oct. 9, 2012), observing that "El Paso MLP was not a corporation, and thus was able to eliminate fiduciary duties pursuant to 17-1101"); Larry E. Ribstein, *The Uncorporation and Corporate Indeterminacy*, 2009 U. Ill. L. Rev. 131, 143 (2009) ("This contrast between the role of fiduciary duties in corporations and uncorporations helps explain why Delaware limits fiduciary duty waivers in corporations while, as discussed in the next Part, freely allowing waiver in unincorporated firms."); Susan Pace Hamill, *Some Musings As LLCs Approach the Fifty-Year Milestone*, 51 Cumb. L. Rev. 1, 28–29 (2021) ("The ability to contractually eliminate fiduciary duties is another controversial area in which corporations and LLCs are treated differently under some state laws. Legal standards that cannot be contractually altered--known as immutable provisions--reflect an important policy that must prevail. The fiduciary duties owed by directors to a corporation have both default and immutable components."); Jonathan G. Rohr, *Freedom of Contract and the*

where equity continues to apply.[193]  The lesson is the same: The General Assembly can displace equity, but only when it does so expressly.

The constraints of equity bind not only as to standards of conduct, but also as to standards of review. Where the General Assembly has authorized it, the constitutive agreements that govern an entity can modify standards of review.  The General Assembly has not authorized corporations to take that step. "Having chosen a for-profit corporate form, . . . directors are bound by the fiduciary duties *and standards that accompany that form*."[194]

---

*Publicly Traded Uncorporation*, 14 N.Y.U. J.L. & Bus. 247, 250–51 (2017) ("Unlike corporations, alternative entities can modify and even eliminate the fiduciary duties of management and controllers."); Winnifred A. Lewis, *Waiving Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies*, 82 Fordham L. Rev. 1017, 1030 (2013) ("[C]orporations can never eliminate fiduciary duties.").

[193] For example, LLCs, which are frequently described in this court and elsewhere as "creatures of contract," *see, e.g.*, *TravelCenters of America, LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008), are not devoid of mandatory components that inhere in every entity whose existence is dependent on an act of the sovereign. *See* 6 *Del. C.* § 18-201; *see also* 8 *Del. C.* § 101; 6 *Del. C.* § 17-201.  Indeed, there are "core attributes of the LLC that only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members." *Carlisle*, 114 A.3d at 605. This court has explained that "when a sovereign makes available an entity with attributes that contracting parties cannot grant themselves by agreement, the entity is not purely contractual.  Because the entity has taken advantage of benefits that the sovereign has provided, the sovereign retains an interest in that entity." *Id.*  Thus, "Delaware courts . . . retain some measure of inherent residual authority so that entities created under the authority of Delaware law could not wholly exempt themselves from Delaware oversight." *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 960 n.8 (Del. Ch. 2010).

[194] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010) (emphasis added).

Chancellor Chandler's decision in *Leonard Loventhal Account v. Hilton Hotels Corp.* illustrates this point.[195] There, the board of Hilton Hotels adopted a rights plan that purported to eliminate any liability that may accrue to the directors when exercising the rights plan. Like the Conclusive-And-Binding Provision in this case, Section 31 of the rights plan purported to make the directors' interpretation of the rights plan "final, conclusive and binding" on the corporation and all other parties. The full provision stated:

> DETERMINATION AND ACTIONS BY THE BOARD OF DIRECTORS. The Board of Directors of the Company shall have the exclusive power and authority to administer this Agreement and to exercise the rights and powers specifically granted to the Board of Directors of the Company or to the Company, or as may be necessary or advisable in the administration of this Agreement, including, without limitation, the right and power to (i) interpret the provisions of this Agreement, and (ii) make all determinations deemed necessary or advisable for the administration of this Agreement (including a determination to redeem or not redeem the Rights or to amend this Agreement). All such actions, calculations, interpretations and determinations (including for purposes of clause (y) below, all omissions with respect to the foregoing) that are done or made by the Board in good faith, shall (x) be final, conclusive and binding on the Company, the Rights Agent, the holders of the Rights, as such, and all other parties, and (y) not subject the Board to any liability to the holders of the Rights.[196]

A stockholder challenged Section 31 as invalid under Section 102(b)(7) and Section 141(a) of the DGCL because it sought to insulate the board and its decisions from equitable review to a greater degree than the DGCL permitted.

---

[195] 2000 WL 1528909, at *11–12 (Del. Ch. Oct. 10, 2000).

[196] *Id.* at *10.

44

Although defense counsel made critical concessions in an effort to moot the plaintiff's challenge to the validity of Section 31, Chancellor Chandler nevertheless took pains to observe that Section 31 was invalid. Quoting the Delaware Supreme Court decision establishing enhanced scrutiny of rights plans, the Chancellor "t[ook] [the] opportunity to reaffirm the principle" that the board would be held to "fiduciary standards any other board of directors would be held to in deciding to adopt a defensive mechanism," regardless of the plan's inclusion of Section 31.[197]

There are admittedly distinctions between the rights plan in *Hilton Hotels* and the Conclusive-And-Binding Provision in this case. A rights plan is a control device that a board adopts unilaterally. The Conclusive-And-Binding Provision in a charter provision that appears in the constitutive document of the Company. But the premise underlying *Hilton Hotels* is that a company cannot seek to obviate equitable review to a greater extent than the General Assembly has permitted. That premise applies equally to the Conclusive-And-Binding Provision.

The Conclusive-And-Binding Provision cannot conclusively empower the Board to make determinations under a good faith standard. The provision cannot prevent the court from applying equitable principles to evaluate the Board's decision.

Having concluded that the Conclusive-And-Binding Provision has no effect on the standard of review, the analysis now addresses the Company's appeal to case law. In the portion of its brief urging an interpretation of the Conclusive-And-Binding Provision that

---

[197] *Id.* at *12 (quoting *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1352 (Del. 1985)).

45

could be viewed as resetting the orientation of Delaware corporate law, the Company cited a grand total of six cases.[198] The Company identified two of the six solely to distinguish them. That means that the Company affirmatively relied on only four cases. For completeness, this decision addresses all six. None support the Company's position.

Of the four cases on which the Company affirmatively relies, it cites two— *Hockessin Community Center, Inc. v. Swift* and *In re IAC/Interactive Corp.*[199]—for the proposition that the plaintiff in an action filed under Section 225 of the DGCL always bears the burden of proof regardless of the circumstances leading to the dispute. From this, the Company extrapolates that an enhanced scrutiny framework under which the Company bears the burden cannot apply in the Section 225 context. Both premises are flatly wrong.

The procedural vehicle through which a stockholder challenges a corporate election does not dictate the allocation of the burden of proof, nor do procedural principles foreclose equitable review. This court retains the "ability to review appropriate claims of inequitable conduct within the boundaries of Section 225,"[200] and the court has reviewed board action under enhanced scrutiny in such contexts.[201] Where enhanced scrutiny applies, so too does

---

[198] One other appears only in a parenthetical as required by The Bluebook, *A Uniform System of Citation*. *See* Def.'s Answering Br. at 36 n.125.

[199] *See* 59 A.3d 437, 453 (Del. Ch. 2012); 948 A.2d 471, 493 (Del. Ch. 2008).

[200] *Brown v. Kellar*, 2018 WL 6721263, at *6 (Del. Ch. Dec. 21, 2018) (applying *Schnell* in the context of a Section 225 dispute, collecting cases).

[201] *See Johnston v. Pedersen*, 28 A.3d 1079, 1089–90 (Del. Ch. 2011) (applying enhanced scrutiny in a Section 225 action concerning a contested election of directors); *see also Brown*, 2018 WL 6721263, at *6–7 & n.50; *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1127 (Del. 2003) (observing that Delaware courts "have remained assiduous in

46

the burden allocation tied to that standard.[202] In both *Hockessin* and *IAC*, the plaintiff challenged only the legal validity of the board action.[203] Because the claims were based on legal invalidity and not equity, the plaintiffs bore the burden of proof. Neither *Hockessin* nor *IAC* stand for the proposition that the procedural vehicle of Section 225 overrides the burden allocation principles of enhanced scrutiny doctrines.

The Company miscites to the third case—*In re Walt Disney Co. Derivative Litigation*—for the definition of good faith. Frequently defined by Delaware courts in the negative—that is, in terms of bad faith[204]—good faith is a subjective standard that requires a fiduciary to act in the best interests of the corporation. To be clear, *Disney* included a textbook definition of bad faith, which the Company does not cite.[205] Rather, the Company

---

carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors").

[202] *See, e.g., Pell*, 135 A.2d at 787 ("When tailored for reviewing director action that affects stockholder voting, enhanced scrutiny requires that the defendant fiduciaries bear the burden of proving (i) that 'their motivations were proper and not selfish,' (ii) that they 'did not preclude stockholders from exercising their right to vote or coerce them into voting a particular way,' and (iii) that the directors' actions 'were reasonable in relation to their legitimate objective.'" (citing *Mercier*, 929 A.2d at 810–11)).

[203] *See Hockessin*, 59 A.3d at 453–64 (assessing validity of director actions under the company's charter and bylaws, under a contract, and under Sections 141, 102(b)(4), and 223(a)(1) of the DGCL); *IAC*, 948 A.2d at 493–512 (assessing legal validity under a governance agreement, the implied covenant of good faith and fair dealing, and the charters of various entities).

[204] *See Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC*, 2009 WL 224904, at *5 (Del. Ch. Jan. 22, 2009) (noting that "in our corporate law, this court has firmly rejected the notion that the words 'not in good faith' mean something different than 'bad faith,' and has done so on sensible policy, logical, and linguistic grounds").

[205] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006) (defining bad faith as an "intentional dereliction of duty, a conscious disregard for one's responsibilities); *see also id.* at 67 (defining bad faith as when a fiduciary (i) "intentionally acts with a purpose

47

pulls a quotation from a portion of the *Disney* decision describing the presumptions of the

business judgment rule to suggest that Article FOURTH's standard means that "[u]nless

the [Board's] decision 'cannot be attributed to any rational business purpose,' courts will

not interfere or second-guess."[206]  The Company's reference to this portion of *Disney* is

misleading.

The Company cites to the fourth case, *Williams v. Geier*, for the proposition that

*Blasius* should be applied rarely,[207] but that uncontroversial statement does not mean that

*Blasius* should not apply here.[208]  Although *Williams* does stand for the proposition that

---

other than that of advancing the best interests of the corporation," (ii) "acts with the intent
to violate applicable positive law, or" (iii) "intentionally fails to act in the face of a known
duty to act, demonstrating a conscious disregard for his duties"); *Goldstein v. Denner*, 2022
WL 1671006, at *40 (Del. Ch. May 26, 2022) ("Bad faith can be the result of 'any human
emotion [that] may cause a director to [intentionally] place his own interests, preferences
or appetites before the welfare of the corporation,' including greed, 'hatred, lust, envy,
revenge, . . . shame or pride.'" (quoting *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL
7036, at *15 (Del. Ch. Jan. 31, 1989)).

[206] Def.'s Answering Br. at 36 & n.125 (quoting *Disney*, 906 A.2d at 74, which in turn
quoted *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[207] Def.'s Answering Br. at 37 (arguing that "[t]here is no sound reason . . . to apply the
heightened review envisioned by *Blasius*" and "[]indeed, as the Supreme Court of
Delaware has noted, '*Blasius*' burden of demonstrating a 'compelling justification' is quite
onerous, and is therefore applied rarely'" (quoting *Williams*, 671 A.2d at 1376)).

[208] *Williams* bears no similarity to this case.  In *Williams*, a stockholder brought suit
challenging an amendment to a certificate of incorporation intended to promote long-term
value for stockholders.  The amendment granted all holders of common stock as of an
established record date super-voting rights of ten votes per share subject to transfer
restrictions.  Stock issued after the record date would be entitled to only one vote until held
for thirty-six consecutive months by the same stockholder.  A majority independent board
approved the amendment and recommended it to stockholders.  A super-majority of
stockholders approved the amendment.  The plaintiff argued that the charter amendment
was for entrenchment purposes and thus subject to *Blasius* review.  The trial court instead
applied the more lenient standard of *Unocal* and ruled in favor of the defendants.  On
appeal, the plaintiff argued that the trial court's application of *Unocal* rather than *Blasius*

*Blasius* should be applied rarely, *Williams* also reaffirms that *Blasius* applies where "the primary purpose of the board's action is to interfere with or impede exercise of the shareholder franchise and the stockholders are not given a full and fair opportunity to vote."[209] As discussed further below, that is the case here.

The Company also fails to effectively distinguish two of the authorities on which Plaintiffs rely, *Pell* and *Blasius*. In *Pell* and *Blasius*, the court applied enhanced scrutiny to evaluate board action to increase or decrease the number of board seats, respectively. The Company draws on this commonality in *Pell* and *Blasius* to fashion a rule that enhanced scrutiny only applies when a board takes action to "change the fundamental structure of the board" or "the nature of the shareholder voting construct."[210] In the Company's view, enhanced scrutiny should apply only where the stockholder franchise is only *indirectly* frustrated, like in *Pell* and *Blasius*, and not *directly* frustrated, as was the case here. The Company's reading of *Pell* and *Blasius* runs contrary to many decisions.[211]

---

constituted reversable error. The high court disagreed and affirmed the trial court's opinion, but on different grounds. The high court held that the trial court erred in applying *Unocal* because "there was no unilateral board action" where the stockholders approved the challenged amendment. *Williams*, 671 A.2d at 1376. In this case, the Company does not (and could not) argue that stockholder ratification restored the business judgment rule.

[209] 671 A.2d at 1376 (cleaned up).

[210] Def.'s Answering Trial Br. at 36–37 (emphasis omitted).

[211] *See, e.g., Mercier*, 929 A.2d at 813–14 (applying enhanced scrutiny to a board's postponement of a vote on a merger, which changed neither the board structure nor the stockholder voting construct); *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *11–12 (Del. Ch. Dec. 4, 2000) (applying enhanced scrutiny to a board's postponement of polls closing at an annual meeting, which changed neither the board structure nor the stockholder voting construct).

Under Delaware law, application of enhanced scrutiny in the stockholder franchise context does not turn on whether the board is purporting to exercise existing authority under certificates or corporations or bylaws, or whether the challenged action changes a board structure. "[I]nequitable action does not become permissible simply because it is legally possible."[212]

Last, and without citing any case law, the Company argues that enhanced scrutiny does not apply because the Board only enforced the Voting Provision, which was adopted on a clear day.[213] That supposed distinction is irrelevant here. Even when a board mechanically applies voting restrictions adopted on a clear day, its application of those restrictions may be subject to enhanced scrutiny.[214]

---

[212] *Schnell*, 285 A.2d at 439.

[213] Def.'s Answering Br. at 36–38.

[214] *See Strategic Inv. Opportunities*, 2022 WL 453607, at *16 (applying enhanced scrutiny to a board's application of bylaws adopted "on a clear day"); *In re Ebix, Inc. S'holder Litig.*, 2016 WL 208402, at *19 (Del. Ch. Jan. 15, 2016) (holding that "Delaware law supports the imposition of *Unocal* scrutiny in this sort of scenario—that is, one where a board implements defensive measures in response to a threat to corporate control that is not immediate, but rather perceived as a future possibility"); *Hills Stores Co. v. Bozic*, 769 A.2d 88, 106–07 (Del. Ch. 2000) (observing that "Delaware case law has assured stockholders that the fact that the court has approved a board's decision to put defenses in place on a clear day does not mean that the board will escape its burden to justify its use of those defenses in the heat of battle under the *Unocal* standard"); *Stroud v. Grace*, 606 A.2d 75, 82 (Del. 1992) (noting that the court has held that *Unocal* enhanced scrutiny applies "to a preemptive defensive measure where the corporation was not under immediate 'attack'" (citing *Moran*, 500 A.2d at 1350–53)); *see also Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *11–13 (Del. Ch. Jan. 14, 1991) (considering *Schnell* and *Blasius* when deciding to enjoin a board's decision not to waive a facially valid advance notice bylaw).

50

For all of these reasons, the court rejects the Company's argument concerning the appropriate standard of review.[215]

## B. Legal Validity

The Board argues that its instruction to Kalahurka correctly applied the Company's Voting Limitation. To determine the legal validity of the Board's instruction, the court must determine whether the Voting Limitation can be applied to groups of stockholders that act in concert, and, if so, whether the stockholders to whom the Board applied this interpretation of the Voting Limitation could be deemed to be acting in concert under these circumstances.

### 1. The Voting Limitation Provides A Basis For The Board To Exclude The Votes Of Stockholders Acting In Concert.

"In examining the provisions of a certificate of incorporation, courts apply the rules of contract interpretation."[216] This is because certificates of incorporation and by-laws are

---

[215] As Vice Chancellor Laster noted in *Trados*, 73 A.3d at 56 n.32, Section 141(a) of the DGCL could be construed as leaving open the possibility that a charter provision could provide a mechanism for tailoring or realigning fiduciary obligations in a manner that alters the traditional fiduciary analysis. Such an argument would rely on the exception to the general rule in Section 141(a), which states: "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors*, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.*" 8 *Del. C.* § 141(a) (emphasis added). The *Trados* decision "provide[d] no opportunity for expressing a view as to the effectiveness of any such mechanism or realignment, and [the court did] not intimate one." 73 A.3d at 56 n.32. It would require a sophisticated and nuanced argument to carry the day on this point. Given the paucity of the briefing, this is not the case to test the scope of the exception to Section 141(a).

[216] *Berlin v. Emerald P'rs*, 552 A.2d 482, 488 (Del. 1988).

51

contracts between stockholders and the corporation.[217] "If no ambiguity is present, the Court must give effect to the clear language of the Certificate."[218] "If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholders' electoral rights."[219] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[220]

The Voting Limitation, found in Article FOURTH, Section 4(C)(1) of the Company's certificate of incorporation, provides that

> Notwithstanding any other provision of this Certificate of Incorporation, in no event shall any record owner of any outstanding Common Stock which is beneficially owned, directly or indirectly, by *a person who*, as of any record date for the determination of stockholders entitled to vote on any matter, beneficially owns in excess of 10% of the then-outstanding shares of Common Stock (the "Limit"), be entitled, or permitted to any vote in respect of the shares held in excess of the Limit.[221]

Section 4(C)(2) contains definitions relevant to the application of the Voting Limitation, including:

---

[217] *See Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation and the general rules of contract interpretation are held to apply.").

[218] *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996).

[219] *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010).

[220] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[221] Certificate of Inc. art. 4(C)(1) (emphasis added).

(a)   "Affiliate" shall have the meaning ascribed to it in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended, as in effect on the date of filing of this Certificate of Incorporation.

(b)   "Beneficial ownership" shall be determined pursuant to Rule 13d-3 of the General Rules and Regulations under the Securities Exchange Act of 1934 . . . ; provided, however, that a person shall, in any event, also be deemed the "beneficial owner" of any Common Stock:

> (1)   which such person or any of its affiliates beneficially owns, directly or indirectly; or . . .
>
> (3)   which is beneficially owned, directly or indirectly, by any other person with which such first mentioned person or any of its Affiliates acts as a partnership, limited partnership, syndicate or other group pursuant to any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of capital stock of this Corporation;

and provided further, however, that (1) no Director or Officer of this Corporation (or any Affiliate of any such Director or Officer) shall, solely by reason of any or all of such Directors or Officers acting in their capacities as such, be deemed, for any purposes hereof, to beneficially own any Common Stock beneficially owned by any other such Director or Officer (or any Affiliate thereof) . . .

(d)   A "person" shall include an individual, firm, *a group acting in concert*, a corporation, a partnership, an association, a joint venture, a pool, a joint stock company, a trust, an unincorporated organization or similar company, a syndicate or any other group formed for the purpose of acquiring, holding, or disposing of securities of any other entity.[222]

The definition of "beneficial ownership" includes a limited carve-out, providing that a

stockholder "shall not be deemed to be the beneficial owner of any voting shares solely by

---

[222] *Id.* art. 4(C)(2) (emphasis added).

reason of a revocable proxy granted for a particular meeting of stockholders . . . with respect to shares of which neither such person nor any such Affiliate is otherwise deemed the beneficial owner."[223]

The Board determined that Johnson, his wife, D. Watson, C. Watson, Morrissey, and Totta were "a group acting in concert" whose shares could thus be aggregated as the shares of a single "person" under the Voting Limitation.[224]  In the Board's view, a plain-meaning construction of the Certificate of Incorporation necessarily leads to the conclusion that a "group acting in concert," as part of the definition of "person," can be substituted into the Voting Limitation like so: "[I]n no event shall . . . a [group acting in concert] who . . . beneficially owns in excess of 10% of the then-outstanding shares of Common Stock . . ., be . . . permitted to any vote in respect of the shares held in excess of the [10% limit]."

Plaintiffs advance several theories why, in their view, the Board's interpretation of the Company's Certificate of Incorporation is incorrect under a plain reading of the text. They contend that the Board's interpretation of "person" would subsume and expand the definitions of "affiliate" and "beneficial ownership," neither of which include the phrase "acting in concert."[225]  They point out that the certificate's Article EIGHTH, which addresses tender offers and offers to merge, includes an identical definition of the word "person," and therefore argue that "person" was defined expansively to ensure that the certificate applies to all forms of people and business entities, not to expand the Voting

[223] *Id.* art. 4(C)(2)(b)(2).

[224] Def.'s Answering Trial Br. at 40–42.

[225] Pls.' Opening Trial Br. at 56–57.

Limitation to allow for the aggregation of people's stockholdings who are neither affiliates of one another nor the beneficial owners of one another's shares.[226]

These arguments fail. The Board's reading of "person" does not "subsume and expand" the definitions of affiliate and beneficial ownership, nor does it expand the Voting Limitation. The definition of "beneficial ownership" includes the word "person," which is defined as, among many other things, "a group acting in concert." Those definitions appear in the section of the certificate that addresses stockholder voting, immediately after the Voting Limitation. A plain reading of the Voting Limitation and the definitions immediately following it compel the conclusion that "a group acting in concert" "who beneficially owns in excess of 10% of the then-outstanding shares of Common Stock" may not vote shares in excess of the 10% limit.[227]

Plaintiffs also point out that the definition of "beneficial ownership" includes a carve-out for those granted a revocable proxy pursuant to a public proxy solicitation, which in their view means that "the Certificate mandates that stockholders' share ownership not be aggregated under the [Voting Limitation] for efforts to elect a slate of directors."[228] The carve-out, however, is not absolute. It merely says that a stockholder may not be deemed a beneficial owner of Company stock "solely by reason of a revocable proxy granted for a particular meeting of stockholders," which has been a standard exception to beneficial

---

[226] *Id.* at 56 n.186.

[227] Certificate of Inc. art. 4(C).

[228] Pls.' Opening Trial Br. at 57.

ownership definitions since at least *Moran*.[229]  The exception leaves open the possibility that, if the Board has additional reasons for making such a determination, the Board can do so. The limited exception for a revocable proxy does not compel the conclusion that stockholders' share ownership can never be aggregated.

Finally, Plaintiffs invoke the canon of construction *ejusdem generis*, under which where general language follows a list of specific words, "such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."[230]  They point out that the definition of "person" includes a long list of entity types, followed by the catch-all "or any other group formed for the purpose of acquiring, holding, or disposing of securities of any other entity."[231]  In Plaintiffs' view, because the definition of "person" does not mention voting, application of the "acting in concert" language in the context of the Voting Limitation is contrary to the drafters' intent.

This final argument fails as well.  The definition of "person" does not need to mention voting; all that matters is that the Voting Limitation applies to a "person," which is defined in part as "a group acting in concert."  The court therefore adopts the Board's reading of the certificate, which allows for the Voting Limitation to be applied to holdings of separate stockholders when the stockholders form a group acting in concert.

---

[229] *See Moran*, 500 A.2d at 1355.

[230] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004) (footnote omitted).

[231] Certificate of Inc. art. 4(C)(2).

## 2. Johnson And D. Watson Were Not Acting In Concert.

The next question is whether the Board correctly applied the acting in concert principle when aggregating the shares of Johnson, D. Watson, and Park's nominees.

The Company's charter does not define "acting in concert." "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract," as "dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract."[232] Black's Law Dictionary is unhelpful.[233] Merriam-Webster defines "concert" as "agreement in design or plan: union formed by mutual communication of opinion and views."[234]

The definition from Merriam-Webster tracks the general corporate law understanding that persons act in concert when they have an agreement, arrangement, or understanding regarding the voting or disposition of shares. That is a longstanding concept under the federal securities laws that historically has been used to determine when

---

[232] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[233] Black's Law Dictionary defines "In Concert" as "See Acting In Concert," but offers no independent definition for acting in concert. *In Concert*, *Black's Law Dictionary* (11th ed. 2019).

[234] *Concert*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/concert (last visited May 16, 2022).

individuals form a group.[235]  Section 203 of the DGCL uses the same concept as one of its definitions of ownership.[236]

The concept of an agreement, arrangement, or understanding appears consistent with the manner in which the Company communicated with stockholders about their holdings and the manner in which Usera and Kalahurka discussed responses to those inquiries.  When the Company sent letters to Johnson, his wife, and other stockholders about their holdings on October 1, 2020, those letters asked for, among other things, the number of Company shares held by the stockholders, their affiliates, or "any other person with which you or any or your Affiliates acts as a partnership, limited partnership, syndicate or other group pursuant to any agreement, arrangement or understanding (whether written or unwritten) for the purpose of acquiring, holding, voting or disposing of any shares of Company stock."[237]

On January 16, 2021, Kalahurka emailed Usera, writing "I know we received a response from Johnson on our information request letter (stating that he had no agreements).  Did we receive a response from O'Dell?"[238]  O'Dell was one of the other

---

[235] *See* 17 C.F.R. § 240.13d-5.  The statement that federal rules have looked to whether persons have an agreement, arrangement, or understanding to determine whether they formed a group is true as a historical matter.  On March 10, 2022, however, the Securities and Exchange Commission proposed amendments to Rule 13D to broaden the circumstances under which persons are treated as a "group."  *See* Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13846-01, 2022 WL 705047, at *13865–72 (proposed Mar. 10, 2022).

[236] *See* 8 *Del. C.* § 203(c)(9)(iii).

[237] *E.g.*, JX-32.

[238] JX-54 at 1.

stockholders from whom the Company requested information. Usera responded in the affirmative, noting that O'Dell and another stockholder, Oliver, "[b]oth stated as well that there was [sic] no agreements. O'Dell did not acquire his stock from Johnson and we do not speculate that there is any agreement. Oliver, however, did acquire shares from Johnson."[239]

Those letters and emails appear to indicate that Usera was on the lookout for agreements, arrangements, or understandings among stockholders that would affect the manner in which a stockholder will vote.

The existence of an agreement, arrangement, or understanding is a sufficient basis for invoking an acting-in-concert provision. An undefined reference to "acting in concert" cannot reasonably go beyond that definition. It cannot be enough that the stockholder plans to vote the same way as another stockholder, is acquainted with another stockholder, or even has a business relationship with another stockholder. This court has rejected far greater showings when considering whether stockholders were sufficiently aligned for purposes of forming a control group.[240]

---

[239] *Id.* Usera testified at his deposition that the Board "still believe[s] that Mr. Johnson and Mr. Oliver are acting in concert," but lacks what the Board considers sufficient evidence to make that determination. Usera Dep. Tr. at 113:4–6.

[240] *See*, *e.g.*, *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 250–56 (Del. 2019); *van der Fluit v. Yates*, 2017 WL 5953514, at *6–7 (Del. Ch. Nov. 30, 2017); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014); *Zimmerman v. Crothall*, 62 A.3d 676, 700 (Del. Ch. 2013); *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *4 (Del. Ch. May 22, 2009); *Feldman v. Cutaia*, 956 A.2d 644, 657–58 (Del. Ch. 2007); *see also Williams Cos. S'holder Litig.*, 2021 WL 754593, at *37 (Del. Ch. Feb. 26, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE) (discussing an acting-in-concert

Stockholder voting rights are sacrosanct. A charter provision that limits their exercise must be plain and unambiguous. The words "acting in concert," standing alone, will not support any greater restriction of stockholder voting rights.

Turning to the question of whether an express or implied agreement, arrangement, or understanding, the court first addresses Park's nominees. The Board determined that Totta was acting in concert with Johnson to get herself elected, but she did not own shares on the Record Date.[241] Morrissey beneficially owned 100 shares on the Record Date.[242] C. Watson is a manager of MLake 96, which owned 500 shares on the Record Date.[243] The court assumes without deciding that their nominations were pursuant to an agreement, arrangement, or understanding that the nominees would vote their 600 shares for their slate, justifying the aggregation of their shares with Johnson's for purposes of the applying the Voting Limitation.

The analysis thus turns to D. Watson, who beneficially owned 37,175 shares on the Record Date through DEW. Whether D. Watson could properly be found to have been acting in concert with Johnson is dispositive as to the question of who won the election.[244]

---

provision that was defined more broadly than an "agreement, arrangement, or understanding" as the "primary offender" when invalidating a poison pill).

[241] PTO ¶ 2.

[242] *Id.* ¶ 4.

[243] *Id.* ¶ 3.

[244] The Board's nominees received 359,336 votes, while Park's nominees received 360,275 votes, a difference of 939 votes. *Id.* ¶¶ 44, 46. The court has assumed that the aggregation of Park's nominees' shares with Johnson's was appropriate, meaning that of the 37,416 votes the Board instructed the election inspector not to count, only DEW's 37,175 shares

In support of the Board's determination that D. Watson was acting in concert with Johnson, the Company points out that, when the Board made its decision, it knew that DEW had acquired 19,500 in advance of the Record Date, that Johnson had fewer shares between September 2020 and the Record Date, and that C. Watson, a Park nominee, was D. Watson's son.[245] The Company also points to the *Robb* findings, but as discussed above, it is unclear the extent to which the Board was familiar with and considered that case when rendering its decision. Finally, the Company highlights the circumstances of DEW's purchase of 19,500 shares from Johnson based on information adduced in discovery, including Johnson's email to Totta and others saying that he was "going to have David watson buy 19500 shares from me ASAP" because he "want[ed] to beat the record date," Totta's arrangement of the transaction, the immediate transfer of the shares followed by a nearly week-long delay in payment, and Johnson's failure to report the sale on his original 2020 tax returns.[246]

None of these facts, individually or in the aggregate, support a finding that Johnson and D. Watson are or were acting in concert pursuant to a mutual agreement, arrangement, or understanding as to how D. Watson would vote his shares. It is unsurprising that Johnson would choose to sell his shares in excess of 10% of the Company's outstanding shares; in his hands, those shares cannot vote and are effectively useless to him in his efforts

---

remain at issue, a difference of 241 votes. Thus, Park's nominees won the election by 698 votes (939 - 241 = 698) if it was inappropriate to count DEW's shares with Johnson's.

[245] Def.'s Answering Trial Br. at 44–46.

[246] *Id.* at 47–48.

to seat directors on the Board. It is unobjectionable that Johnson would choose to sell those non-voting shares to his friend and business partner, D. Watson. Company insiders have been selling shares to one another for years, and the Company has strenuously argued that those stockholders were not acting in concert with each other when they did so.[247] It is also both unsurprising and unobjectionable that D. Watson would vote for his son to join the Board. There is no evidence, for example, that Park nominated C. Watson in a quid pro quo for D. Watson's votes; C. Watson has worked for Johnson's entities for years and the record reflects no indication that he was nominated for any reason other than merit and, perhaps, to vote MLake 96's shares for Park's nominees.

In the end, the court has been presented with: a contract evidencing a transaction in which DEW purchased 19,500 shares from Johnson at a price that no party has argued was discounted;[248] an amended tax return reporting the entire purchase price as a capital gain, inviting tax consequences;[249] a letter to the Federal Reserve reporting the transaction,[250] to which the Federal Reserve did not object despite Johnson's history;[251] and deposition testimony from D. Watson that he has not entered into a voting agreement of any kind with respect to his shares, which is consistent with his representations to the Company.[252]

---

[247] *Id.* at 53.

[248] JX-44 at 3; *see also* JX-27 (Park offering to buy Company stock in September 2020 for $16.33 per share, less than the $16.42 per share price at which the DEW sale was consummated).

[249] JX-87 at 7.

[250] JX-44 at 2.

[251] Johnson Dep. Tr. at 170:9–171:3.

[252] D. Watson Dep. Tr. at 116:6–19; JX-68 at 2.

On this record, the court cannot find that the Board's instruction not to count D. Watson's 37,175 votes was legally valid, because there is insufficient evidence to find that D. Watson and Johnson were acting in concert.

## C.     Enhanced Scrutiny Under *Blasius*

It is a fundamental principle of Delaware law that boards of directors manage the business and affairs of corporations, and courts will respect the decisions that directors make pursuant to their sound business judgment. "Nevertheless, there are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. . . . [by] subject[ing] the directors' conduct to enhanced scrutiny to ensure that it is reasonable."[253] "The *Blasius* compelling justification standard of enhanced judicial review is based upon accepted and well-established legal tenets."[254] Delaware courts "have recognized the substantial degree of congruence between the rationale that led to the *Blasius* 'compelling justification' enhanced standard of judicial review and the logical extension of that rationale *within* the context of the *Unocal* enhanced standard of judicial review."[255]

*Blasius* established a two-part test that asks, first, whether the board acted "for the primary purpose of impeding the exercise of stockholder voting power," and second,

---

[253] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994).

[254] *Liquid Audio*, 813 A.2d at 1129.

[255] *Id.* (emphasis in original); *accord Stroud*, 606 A.2d at 92 n.3 ("In certain circumstances, a court must recognize the special import of protecting the shareholders' franchise within *Unocal*'s requirement that any defensive measure be proportionate and reasonable in relation to the threat posed." (quotation marks omitted)).

63

whether the board has established "a compelling justification for such action."[256] The court addresses each step of the test in turn.

### 1. Primary Purpose

The first, subjective inquiry of the *Blasius* test asks whether the "primary purpose of a board of directors' defensive measure is to interfere with or impede the effective exercise of the shareholder franchise in a contested election for directors."[257]

Under these unusual circumstances, where the Board expressly instructed the inspector of elections not to count a certain number of votes from particular stockholders, it becomes self-evident that the Board took action to interfere with the ability of certain stockholders to vote their shares. Thus, the court finds that the Board's primary purpose in giving its instruction to Kalahurka was to interfere with the effective exercise of the shareholder franchise in a contested election for directors.

The parties did not focus on this aspect of the *Blasius* standard in briefing. At trial, the Company's counsel argued that the Board's instruction was not given "with the primary purpose of interfering with the stockholder vote."[258] Rather, the Board's "primary purpose was to protect the shareholders from [a] corporate takeover."[259] This proffered "primary purpose," however, more appropriately speaks to whether the action was justified.

---

[256] *Blasius*, 564 A.2d at 661–63.

[257] *Liquid Audio*, 813 A.2d at 1132 (emphasis omitted).

[258] Trial Tr. at 112:5–6.

[259] *Id.* at 112:7–9.

## 2. Compelling Justification

Having satisfied the first step of *Blasius*, the court turns to the question of whether the Board has demonstrated a compelling justification for its actions. To satisfy the compelling-justification standard, "the directors must show that their actions were reasonable in relation to their legitimate objective, and did not preclude the stockholders from exercising their right to vote or coerce them into voting a particular way."[260] "In this context, the shift from 'reasonable' to 'compelling' requires that the directors establish a closer fit between means and ends."[261]

It is important to note that "the belief that directors know better than stockholders is not a legitimate justification when the question involves who should serve on the board of a Delaware corporation."[262] "[E]ven a board's honest belief that its incumbency protects and advances the best interests of the stockholders is not a compelling justification. Instead, such action typically amounts to an unintentional violation of the duty of loyalty."[263] In fact, "[t]he notion that directors know better than the stockholders about who should be on the board is no justification at all."[264]

Unfortunately for the Company, the Board's sole justification for its decision to exclude the votes at issue is "protecting [the Company's] shareholders from Mr. Johnson's

---

[260] *Mercier*, 929 A.2d at 810–11.

[261] *Pell*, 135 A.3d at 787 (citation omitted).

[262] *Id.* at 790.

[263] *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 602 (Del. Ch. 2006) (footnotes omitted).

[264] *Mercier*, 929 A.2d at 811.

effort to 'take control' and 'consider selling the bank.'"[265]   The Company characterizes Johnson as a corporate raider intending to sell the Bank, someone from whom it believes the Board had an obligation to protect the Company's stockholders.   The Company observes that Johnson has attempted to seat directors on the Board for over a decade and has floated his position in tender offers that the Company should add board members, improve management and profitability, and consider selling the bank.

Yet there are numerous deficiencies with the Company's corporate-raider justification argument.   For starters, the Company has a staggered seven-member board. Even if Park's three nominees were seated directly after the 2021 election, therefore, they could not have taken any action on behalf of the Board, such as attempting to sell the Bank, without a majority.   This mitigates any "need" to prevent their installment to keep the Bank from being sold.

Even the Company's characterization of Johnson as a "corporate raider" is problematic.   The court need not, and does not, decide whether that characterization is accurate.   But the Company's argument calls to mind an observation made by Chancellor Allen in *Sutton Holding Corp. v. DeSoto, Inc.*[266]   In *Sutton*, the court evaluated whether a electing a dissident slate of directors would constitute a "change in control" as defined in provisions the defendant company's pension plans.[267]   The court noted that the purpose of those kinds of provisions "is to foreclose a 'raider' from financing any part of a 'takeover'

---

[265] Def.'s Answering Trial Br. at 49.

[266] 1991 WL 80223 (Del. Ch. May 14, 1991).

[267] *Id.* at *1.

by resorting to the Company's excess pension funding . . . . The most critical defect, in my opinion, is the fact that the 'enemy' here, the raider, includes anyone that the shareholders elect but that the board has not nominated."[268]  Similarly, the Company's arguments about "corporate raiders" and "acting in concert" appear directed at anyone who the Board does not approve, and exempts anyone who is a member of the incumbent Board.[269]

As important, the Company's argument is directly contrary to the well-established law of this state.  Even if Park's nominees would, once seated, propose to sell the Bank, and that is not at all an obvious conclusion to draw from the record before the court, the decision to elect those nominees must be left to the Company's stockholders.  The Board does not have an obligation to "protect" stockholders from that outcome by excluding votes for insurgent nominees.  Quite the opposite.  The Board has an affirmative obligation not to interfere with the stockholder franchise without a compelling justification, and its sole justification is perhaps the only justification the Company could possibly have raised that is foreclosed under Delaware law.

In *Liquid Audio*, for example, the board of directors responded to a plaintiff-stockholder, MM Companies, Inc., that had "sought to obtain control of Liquid Audio" "[f]or more than a year" by expanding the size of the board from five to seven and

---

[268] *Id.* at *1 n.3.

[269] *See Chesapeake Corp. v. Shore*, 771 A.2d 293, 345 (Del. Ch. 2000) (footnotes omitted) ("The primary purpose for this action was to impair Chesapeake's ability to win the Consent Solicitation by increasing the required majority Chesapeake needed to obtain to preclusive levels.  Compounding this intentional impairment of the franchise was the defendants' decision to apply a very different standard to their own self-interest than they did to that of Chesapeake and Ariel.").

appointing two directors when it became "apparent that MM's nominees . . . would be elected at the annual meeting."[270] The Delaware Supreme Court noted the Court of Chancery's conclusion that the board had acted with the "primary purpose of diminishing the influence of MM's two nominees on a five-member Board by eliminating either the possibility of a deadlock on the board or of MM controlling the Board, if one or two Director Defendants resigned from the Board."[271] The court held that, despite the plaintiff's attempts to seat directors and increase the size of the board by an additional four seats to be filled with more of plaintiff's nominees, the board "did not demonstrate a compelling justification" for its decision to attempt to reduce the plaintiff's influence on the board.[272]

Thus, the court finds that the Board's action was both legally invalid, as discussed above, and void under *Blasius* for failing to demonstrate a compelling justification.

## III. CONCLUSION

For the foregoing reasons, the court finds that the Board's instruction to the inspector of elections was improper as to DEW's 37,175 votes. This conclusion is no doubt a bitter pill for the Board to swallow. Many of the Company directors appeared at trial (by Zoom) to signal their earnest desire to defend the Board's actions. Deeming their

---

[270] *Liquid Audio*, 813 A.2d at 1122, 1124.

[271] *Id.* at 1132.

[272] *Id.* at 1123, 1132; *see also Chesapeake*, 771 A.2d at 345 (holding that the "mild threat" posed to the target company by a potential acquirer's tender offer and consent solicitation did not provide a compelling justification for the adoption of a supermajority bylaw, the primary purpose of which was to impair the acquirer's ability to win the consent solicitation).

application of the Voting Limitation legally invalid does not make them bad people; however, it does require judgment in Plaintiffs' favor. More than a year has elapsed since this case was filed, and the Company has held another annual election in the interim.[273] The parties did not meaningfully brief the significance of this fact when addressing the requested relief. The parties shall confer on a schedule for promptly presenting their respective positions on how to justly implement this ruling given the passage of time.

---

[273] Pls.' Opening Trial Br. at 4.